John B. MEARS, Plaintiff-Appellee,

v.

OLIN, a corporation, Defendant-Appellant.

No. 74–1565.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 7, 1975.

Decided Feb. 28, 1975.

Fredric H. Kauffman, Lincoln, Neb., for defendant-appellant.

Francis M. Casey, Plattsmouth, Neb., for plaintiff-appellee.

Before JOHNSEN, Senior Circuit Judge, and STEPHENSON and WEBSTER, Circuit Judges.

STEPHENSON, Circuit Judge.

John B. Mears brought this products liability action against Olin Corporation claiming a factory defect in a Winchester rifle. The case was tried to the United States District Court for the District of Nebraska, Honorable Robert V. Denney, without a jury. Mears was awarded $63,919.77 in damages. Olin appeals, claiming trial court errors in the admission of expert testimony, and challenges the sufficiency of the evidence to support plaintiff's verdict. We affirm.

Appellee Mears was road hunting for coyotes southeast of Nebraska City, Nebraska. His firearm was a Winchester

Model 94 rifle, Theodore Roosevelt Commemorative Edition.[1]

Upon sighting a coyote, Mears picked his Winchester from the seat beside him, aimed through the open window of the driver's side of the car, cocked, and fired. The bullet missed its mark and the coyote ran. Mears placed the rifle, barrel down, butt up, next to him on the seat. Noticing that the coyote had run only a few yards, Mears again reached for his rifle. This time he cocked the gun inside the car. Then, in trying to maneuver the muzzle out the window, the butt of the rifle struck the headrest or the ceiling of the car. The gun discharged, the bullet striking Mears in the right leg.

Mears prepared a tourniquet and drove himself to the hospital. Ultimately, the leg was amputated below the knee.

Because it becomes a major bone of contention, we will give a general recount of the custody of the subject rifle from the time of the accident until the lawsuit was tried.

The accident occurred on February 20, 1970. Until that time the rifle had been fired approximately forty-three times. Mears' testimony was that he had noticed nothing unusual about the rifle but that on "a couple" of occasions the hammer dropped from a full-cocked position to a half-cocked position (safety position) without the trigger being touched.

Following the accident, the rifle was taken to Mr. Lloyd Barton for cleaning. He noticed nothing unusual about the rifle.

On June 14, 1971 Mr. Francis M. Casey, Mears' attorney, took the subject rifle to Bernard Basel, who removed the hammer and sear.[2] Mr. Casey picked up the rifle, hammer and sear and caused them to be photographed. The rifle was then delivered to Expertise Institute in Miami, Florida for expert analysis.[3]

The rifle was delivered to Olin at its Winchester factory for examination on August 22, 1972. Olin's experts found the rifle to be generally in bad condition. They fired the gun and subjected it to sixteen drop tests[4] to determine whether the hammer would fall to the firing pin. Upon magnified examination of the sear, Olin experts determined that it was damaged. Even so, both hammer and sear were within factory specifications. According to the Olin experts, the damage to the sear was not due to normal firing of the gun but was caused by excessive drop testing and/or filing.

Upon reassembly of the rifle, it would no longer hold in a cocked position. Olin experts did not directly explain this fact.

In October of 1972 the hammer and sear underwent examination at the University of Nebraska by Olin's retained expert, Mr. Harper. Thereafter, in February 1973 the rifle was examined by Mears' expert, Mr. O'Neill, and later by another expert, Mr. Mart, who conducted further drop tests interchanging a substitute hammer and sear.

Finally, the hammer and sear were returned to Olin's Winchester plant and again subjected to factory tests. The tests showed that the sear had been reduced in size since the August 22 examination. Nevertheless, both hammer and sear were still within factory specifications.

The deposition of the Institute's owner, Harold Tuthill, was offered in evidence for the sole purpose of showing "why [plaintiff] did not call Expertise Institute as a witness in this case."

1. The rifle is a Winchester lever action 30/30. The commemorative edition has a nickel-plated hammer, trigger and receiver.

2. "At the lower portion of the hammer are two notches, the sear notch and the half cock (safety) notch. The rotation of the hammer causes these notches to pass over an intermediate between the hammer and the trigger called the sear." Appellant Brief at 13.

3. The report of the expert from Expertise Institute was excluded from evidence as hearsay.

4. "The rifle is dropped to the floor from a designated heighth, producing external stresses which are obvious. The purpose of the test is simply to determine the sensitivity of the hammer's engagement with the sear in the cocked position." Appellant Brief at 24.

After briefly summarizing the expert testimony, the trial court wrote:

It is the Court's conclusions from this testimony that some property or the manner of construction and fitting of the original hammer caused it to beat down the sear in such a way that the hammer, when cocked and subjected to a jarring effect on the rifle, could fall by the force of the mainspring to the firing pin, discharging the weapon. It is apparent that this condition of the hammer was present when it left the factory, and there was no attempt at testimony to the contrary.

The central appellate focus boils down to this: Olin claims that since all expert examination of the subject rifle took place on and after August 22, 1972, and since the rifle is unaccounted for during the nine and one-half months it was in the possession of Expertise Institute, it follows that no basis exists for concluding that a manufacturing defect was present. Attendant and a part of this argument is the claim that excessive drop testing caused the defect and that all drop testing took place after the accident.

■ The facts, of course, were controverted and conflicting. Experts testified for both sides. Our review is limited by Rule 52(a), Federal Rules of Civil Procedure. We cannot review the case *de novo*. We view the evidence in the light most favorable to the prevailing party, and we cannot reverse the trial court unless we should find that its findings are clearly erroneous. We must bear in mind that the trial judge has had the better opportunity to weigh the credibility of the witnesses. *Zenith Corp. v. Hazeltine*, 395 U.S. 100, 123, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948);

*Snodgrass v. Nelson*, 503 F.2d 94, 95 (8th Cir. 1974); *Moorhead Construction Co. v. City of Grand Forks*, 508 F.2d 1008, at 1012 (8th Cir. filed January 3, 1975).

■ The fact that the rifle was unaccounted for at the hands of Expertise Institute becomes immaterial in light of the trial court's findings. The court expressly discredited the testimony regarding file marks on the sear,[5] thus rejecting any implication that post-accident tampering with the parts contributed to the defective condition. Based on our reading of the entire record, that finding is not clearly erroneous.[6]

■ We agree with appellant Olin that there was ample evidence that drop testing wore down the sear. Experts for both sides agreed that drop testing places undue stress upon the hammer and sear. That fact, however, in light of the other evidence in the case, does not preclude a finding that a factory or design defect in the hammer caused the sear to wear down and cause the accident.

■ Mears testified that the hammer had slipped to half cock on two occasions before the accident. There is ample evidence that such slippage puts stress on the sear and wears it down. Plaintiff's expert Mart testified that a factory defect caused the malfunction. Plaintiff's expert O'Neill testified that a design error in the hammer caused the slippage. Both these opinions were partially premised upon the assumption that drop testing had been done on the parts after the accident but that no alteration of the parts by an outside force had occurred. Mart conducted fifty drop tests with a replacement hammer and the subject sear. The hammer fell to the firing pin on five or six occasions. He conducted fifty drop tests with the subject hammer and a replacement sear. The hammer

---

5. The trial court stated:

Defendant's experts also testified that the sear appeared to have been honed or filed down. The Court does not find this to be the case. However, assuming arguendo that the sear was filed or honed, it does not appear to have contributed to the defective condition hereinafter found by the Court.

6. There were pictures in evidence showing the condition of the sear and hammer both before and after the gun went to Expertise Institute.

fell to the firing pin four times. When Mr. Mart conducted fifty drop tests with a replacement hammer and replacement sear, the hammer fell to the firing pin once.

Olin's experts testified that after drop testing the gun would not hold a cock although the parts were within design specifications. They testified that they were unable to determine why the gun would not hold a cock.

Based upon our reading of the entire record, we are satisfied that Judge Denney has made permissible findings of fact.

■ Olin contends that Mears was contributorily negligent, assumed the risk, or proximately caused his own injuries. We agree with the trial court that "there is no doubt that plaintiff [Mears] was less than cautious when he levered the weapon inside the vehicle." Nevertheless, the court properly found that Mears' action did not amount to unreasonable use of the product.

Olin's final appellate point is that plaintiff's expert O'Neill was not properly qualified and that hypothetical questions posed by Mr. Casey to both his experts were improper.

■■ Whether a witness is qualified to testify as an expert is generally within the discretion of the trial court. We are satisfied that Dr. O'Neill, by reason of his expertise in metallurgy and material science, was able to lend meaningful insight to the fact finding process. *Hoppe v. Midwest Conveyor Co., Inc.*, 485 F.2d 1196, 1202 (8th Cir. 1973). The court as fact finder had the right to weigh the testimony. *St. Louis-San Francisco Ry. Co. v. Armco Steel Corp.*, 490 F.2d 367, 369 (8th Cir. 1974).

■ We reject the claim that plaintiff's hypothetical questions were improperly foundationed. The record demonstrates that the hypotheticals assumed all material facts necessary for the experts to draw rational conclusions. *Harris v. Smith*, 372 F.2d 806, 812 (8th Cir. 1967). They were subjected to vigorous cross-examination.

Although as original triers of the facts we might have arrived at a different result, we conclude that the judgment of the district court is based on findings of fact which are not clearly erroneous and no error of law appears.

Affirmed.