581 F.Supp. 889 (1984)
The AETNA CASUALTY AND SURETY COMPANY, and Southwestern Bell Telephone Company, Plaintiff,
v.
GENERAL ELECTRIC COMPANY, Defendant.
Nos. 81-869 C (D), 81-1284 C (D).
United States District Court, E.D. Missouri.
February 3, 1984.
*890 Anthony J. Sestric, Gary R. Underwood, St. Louis, Mo., for plaintiff.
Shepherd, Sandberg & Phoenix, Gerald D. Morris, St. Louis, Mo., for defendant.

MEMORANDUM
WANGELIN, District Judge.
This matter is before the Court for a judgment on the merits following a six (6) day trial. After careful consideration of the pleadings, evidence and briefs presented during the course of this trial, this Court enters the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. Any finding of fact equally applicable as a conclusion of law is adopted as such and, conversely, any conclusion of law equally applicable as a finding of fact is adopted as such.

FINDINGS OF FACT
1. On the evening of February 5, 1979, a fire started on the seventh floor of the Syndicate Trust Building. The fire did extensive damage to the seventh floor of the building and caused smoke damage to the eighth, nineth and tenth floors. At the time of the fire, Southwestern Bell was renting the seventh floor as a storage area for panels used in the construction of office cubicles. Although the panels were metal, they were wrapped in a material, Kraft paper, that was combustible and apparently served to fuel the fire.
2. Plaintiffs' evidence indicates that the fire originated from a ceiling-mounted florescent lamp in a storage room on the seventh floor. Plaintiffs' experts in this regard, William Buxton and Charles Cima, came to this conclusion because the panels stored in the room had fallen toward the center of the room. This condition is indicative of an aerial fire. Moreover, the florescent lamps were found at the bottom of the debris.
3. Buxton and Cima initially concluded that the florescent lamps had been improperly mounted too close to the ceiling, providing insufficient space for ventilation. They theorized that the ballasts within the florescent lamps had overheated, thereby causing the asphaltic pitch within the ballast to melt out from its closed metal container. Once outside the ballasts, Buxton and Cima believed that the melted asphalt ignited the surrounding acoustical ceiling tiles. As these tiles fell on the covered panels, the Kraft paper also ignited, setting the room ablaze. There was no sprinkler system in the fire room. The sprinkler system terminated just before entering the room.
4. Another factor which led Buxton and Cima to believe that the florescent lights ignited the fire was their conclusion that the lights were powered, i.e. electricity was being supplied to them. The investigators came to their conclusion because the lights were in the "on" position and the fuses connected to the lights had been blown. They could find no direct short or arcing in the wiring between the fuses and the lights to account for the blown condition of the fuses. Thus, plaintiffs argue that the evidence supports their theory that the lights were powered and started the fire.
5. Defendant vigorously disputes plaintiffs' theory concerning the origin of the *891 fire. First, defendant contends that the fire originated in the northwest corner of a private office around a hollow column containing electrical and piping chase. Defendant draws support for this argument from reports made by a claims adjuster for the Aetna Casualty and Surety Company. The adjuster found what he believed to be a "low burn" area, indicative of the fire's origin, around the piping chase. However, while the adjuster had viewed a number of fire scenes, he is not an expert in this science. Consequently, the Court lends substantially greater weight to the report of Buxton and Cima as determinative of the origin of the fire.
6. Defendant also questioned plaintiffs' assertion that the lights were powered at the time of the fire. Defendant points out that whether the lights were in the "on" position does not determine whether the lights were necessarily powered. This is because there were three switches serving that particular circuit and all of the switches were three-way switches. The position of a three-way switch is not determinative of whether the lights were powered because the actual function of the switch is dependent on the positions of the other two switches.
7. Moreover, defendant contends that the two ruptured fuses is not indicative of whether the lights were powered. Although no direct short or arcing was found, Buxton and Cima concluded in their original report that heat generated in the fire room transmitted back through the copper wire and constituted a sufficient cause for the fuses to blow. They stated that fuses blown because of radiation and transmission through the lines is a common occurrence in fires. In this regard, it would appear that plaintiffs' position is at odds with the report of their own experts.
8. The question of whether the fixtures were improperly mounted is also disputed between the parties. As noted above, Buxton and Cima initially believed that the fire occurred because the ballast had insufficient ventilation causing the asphaltic pitch to melt and ignite the surrounding acoustical ceiling tiles. Plaintiffs now contend that their own experts were incorrect in this regard also. Plaintiffs argue that Buxton and Cima believed that the fixtures were surface-mounted based on their observation of the adjacent Mayfield Room which contains surface-mounted fixtures. Subsequent evidence, however, revealed that the fixtures were stem mounted, i.e. they were suspended below the ceiling on metal rods. Plaintiffs support this assertion by noting that the majority of the fixtures in the adjacent rooms, except the Mayfield Room, were stem mounted, that two former employees of H.S. Missouri Associates, the owner of the building, testified that the fixtures were stem mounted, and that the investigator for Aetna, Mr. McDermott, stated that he observed the remains of stems on the ceiling of the fire room. From this evidence the Court, finds despite Buxton's and Cima's report, that the fixtures were, in fact, stem mounted.
9. The accused ballast in this cause is General Electric model 6G3512. This ballast was manufactured from 1959 to 1961. It contained no thermal protectors.
10. A ballast performs a number of functions in the operation of a florescent lamp. The ballast acts as a voltage transformer, a device to limit the current to the design level for the lamp, an ionizer, a mechanism to provide the fillamentry heat necessary for the normal operation of the lamp, a device to provide ray interference suppression and to provide acoustic damping. The actual ballast consists of a compacitator, a coil, and a core contained in a metal channel cover. The physical components of a ballast most pertinent to the adjudication of this cause is the copper wire surrounded by asphaltic pitch.
11. When a ballast reaches the end of its useful life, it will begin to generate excessive heat due to the deterioration of its component parts including coil insulation, asphaltic pitch, and the copper wiring. Plaintiffs assert that the generation of heat will cause the asphaltic pitch and insulation to expel combustible gases at some temperature between approximately four hundred *892 (400) degrees Fahrenheit to four hundred eighty (480) degrees Fahrenheit. The internal ballast temperature will continue to climb until power is terminated in some manner. If the power terminates because of a short circuit or arcing electricity the combustible gases may explode and blow a hole through the ballast container. If the power is not terminated, the asphaltic pitch reaches a fire point at five hundred sixty (560) degrees Fahrenheit at which point it can be ignited by an external spark and continue to burn. The self ignition point of asphalt is eight hundred twenty-five (825) degrees Fahrenheit at which point the asphalt will ignite if oxygen is present without any spark or arcing. Although somewhat disputed by defendant, this Court finds that ballasts can cause fires.
12. A thermal protector is a device which limits the internal temperature within a ballast by disengaging the electrical supply when the temperature becomes too high. Defendant's expert, however, maintained that thermal protectors were not integated with ballasts for that purpose. Regardless of defendant's reason for installing thermal protectors, it appears that they do aid in the prevention of fires. The extent of this fire-prevention function, and whether a thermal protector would have prevented the fire in the present cause, is not clearly set forth by plaintiffs.
13. Investigators found six (6) ballasts at the bottom of the debris in the fire room along with their attendant light fixtures. The manufacturer of the fixtures could not be determined. Furthermore, defendant did not manufacture all of the ballast found in the room. In addition to the accused ballast, two of the other ballasts were model 6G3512 manufactured by defendant. Two other ballasts were not manufactured by defendant. The sixth ballast was manufactured by defendant, but was a different model.
14. Plaintiffs' assertion that the accused ballast started the fire is based on two physical characteristics. Although plaintiffs' expert, Mr. Roger Landers, could find no defect in the ballast he concluded that it started the fire because (1) the copper wires were extremely brittle; and (2) there was paint on the outside of the ballast can but not on the inside of the can.
15. Plaintiffs assert that the brittle copper wire indicates that "hydrogen embrittlement" occurred within the ballast. Plaintiffs' expert examined the various ballasts and determined that the accused ballast evidenced a greater degree of embrittlement of its wire than the other ballasts. Landers concluded from this observation that the ballast had suffered "hydrogen embrittlement" due to a defective condition in the ballast which allowed it to overheat.
16. Plaintiffs' theorize that a shorted coil or a shorted turn in the coil generated excessive heat as the ballast deteriorated in its end-of-life stage. As the temperature increased, it created a condition which allowed the hydrogen present in the ballast casing to penetrate the copper wire and react with the oxygen which is present in the copper in either a dissolved state or as copper-oxide. When the hydrogen bonds with the oxygen, steam forms, and the resulting pressure causes the copper wire to crack.
Thus, while an embrittled copper wire is not necessarily a defective condition, it is, plaintiffs assert, evidence that a defect must have existed.
17. Defendant disputes the theory at several points. First, defendant's expert, Mr. Walter Powell, ranked the relative embrittlement of the copper wire within the various ballast in a different order than did plaintiffs' expert. Powell found that two other ballasts found in the debris of the fire scene were more embrittled than the accused ballast.
18. Second, defendant contends that Landers' knowledge of hydrogen embrittlement extended only to a shorted layer of turns and not a single turn short as existed in the accused ballast. Powell testified that a shorted layer of turns would be significantly more damaging than a single turn short and that a shorted layer of turns would produce an obvious visible defect in the coil not found in any of the ballasts.
*893 19. Third, defendant argues that the fire itself may have caused the embrittled condition of the ballast. Defendant relies on an experiment performed by Dr. Donald Askeland to support this proposition. Dr. Askeland, a metallurgical consultant, obtained a ballast manufactured at approximately the same time as the accused ballast but by a different manufacturer. The test ballast was placed in an oven and heated to fifteen hundred (1500) degrees Fahrenheit for approximately twenty-five (25) minutes, then allowed to cool. This procedure closely approximates the temperatures encountered in an actual fire.
In the initial stage of the heating process, the ballast emitted a puff of white smoke. Sometime afterward all of the asphalt dripped out of the ballast case. Finally, when the ballast was extracted from the oven, the copper wire within it was extremely brittle.
20. When this experiment is considered in conjunction with the fact that witnesses for both plaintiff and defendant reported embrittlement in other wires in the fire room, it becomes apparent that the embrittlement of the wires in the accused ballast may have been caused by the external heat of the fire rather than a defect in the ballast.
21. Plaintiffs argue that the absence of paint on the inside of the ballast case is also indicative of the defected condition of the ballast. Plaintiffs contend that the absence of a thermal protector in the ballast allowed it to overheat and burn the paint off the inside of the ballast case. Defendant proposes an alternate theory; that the paint on the interior of the can was pulled off by the asphalt as it contracted after the fire.
22. Neither plaintiffs' nor defendant's theory conclusively determine whether the accused ballast was defective. Defendant's theory is patently incorrect because, as plaintiffs point out, there was no asphalt found in the ballast can. Therefore, the asphalt could not have cooled and pulled the paint off while it was still within the ballast case or there would have been traces of asphalt found within the case.
23. While defendant's theory would appear to be concurrent with the physical evidence, another set of facts would explain the lack of paint without any reference to a defect in the accused ballast. The evidence presented to this Court establishes that asphalt will self-ignite at eight hundred twenty five (825) degrees Fahrenheit. Moreover, during Dr. Askeland's oven test, it was established that temperatures in a fire may reach fifteen hundred (1500) degrees Fahrenheit. Therefore, it does not seem impossible nor improbable that during the course of the fire, the asphalt reach its self-ignition point and burned out of the ballast case. Thus, although the asphalt may have burned out of the case as plaintiffs assert, this does not necessarily establish that the ballast was defective. Indeed, this merely establishes that asphaltic pitch within the ballast encountered extremely high temperatures, such as those found in a fire.
24. Defendant points out another physical fact which vitiates plaintiffs' theory of a defective ballast. Defendant contends that it was unnecessary to supply a thermal protector on its 6G3512 ballast because the solder joints on the ballast served this function. Unlike other manufacturers, General Electric employs paste solder wire leads from the power supply into the ballast. The material used as solder melts at temperatures between four hundred sixty (460) and five hundred (500) degrees Fahrenheit. This temperature is significantly below both the five hundred sixty (560) degree fire point of asphalt and the eight hundred twenty five (825) degree self-ignition point of asphalt. It is also below the seven hundred (700) to seven hundred fifty (750) degree Fahrenheit temperature which is necessary to achieve hydrogen embrittlement.
25. Defendant raises two other factual issues pertinent to a careful adjudication of this matter. First, defendant points out that photographs of the accused fixture, which was never identified as being manufactured *894 by defendant, reveal the existence of a possible are mark. Defendant argues that the absence of all of the fixture wiring in the fire room, in conjunction with the alleged are mark, indicate that the fixture may have started the fire.
26. Second, defendant contends that not all of the fixtures and ballasts were retrieved from the fire. This assertion is based on the incongruity between the ballasts and the fixtures presented to the Court. Defendant argues that the accused ballast and the other two ballasts that are model 6G3512 will power and are compatible only with two-foot twenty (20) watt lamp fixtures, but that only two of these types of fixtures were presented to this Court, the accused fixture and a second two foot fixture. Thus, defendant concludes that a third two-foot fixture is missing.
Similarly, defendant concludes that the four-foot forty (40) watt lamp fixture presented to the Court has no compatible ballast. It cannot be powered by the extra 6G3512 model ballast, and all of the other fixtures and ballasts are perfectly matched. Thus, there is apparently a fixture and a ballast which were never retrieved from the fire room.

CONCLUSIONS OF LAW
This is a consolidated cause. The first suit was filed under Cause No. 81-0869 by the Aetna Casualty and Surety Company (hereinafter Aetna). Aetna named the General Electric Company (hereinafter G.E.), Color-Art, Inc. (hereinafter Color-Art) and the Tarlton Construction Company (hereinafter Tarlton) as defendants. Aetna claimed that Color-Art, which had entered into a contract with Southwestern Bell to supply office furnishings for the renovation of the seventh floor of the Syndicate Trust Building, was negligent in providing combustible furnishings and packaging, in deciding to store the furnishings on the seventh floor, and in leaving the electric lights on. Aetna's claim against Tarlton, the contractor for the renovation operation, alleged that Tarlton was negligent in supervising the storage on the seventh floor because a portion of that floor had no sprinklers and because Tarlton knew or should have known that the furnishings were highly flammable.
The second action was a suit solely by Southwestern Bell and G.E. The allegations against G.E. are identical to those in the Aetna case.
Prior to trial Aetna dismissed without prejudice its claim against Tarlton. At the close of the evidence in the consolidated trial, Aetna and G.E. dismissed their claims against Color-Art without prejudice.
The complaint is stated in three counts. Count I alleges that G.E. was negligent in manufacturing and selling ballasts without thermal protectors and in failing to recall the ballasts or warn the consumer after the defendant knew or should have known of the danger. In Count II, Aetna alleges that G.E. expressly and impliedly warranted that the fluorescent light ballast would be safe for its ordinary intended use. G.E. allegedly breached this warranty because the ballast was not of merchantable quality in that it over heated and shorted out and was not equipped with a thermal protector. In Count III, Aetna alleges that G.E. was liable under strict liability for the construction, design, and sale of a ballast without a thermal protector.
G.E. alleges contributory negligence on the part of H.S. Missouri Associates (hereinafter H.S.M.), Aetna's insured, as an affirmative defense in the Aetna cause. G.E. contends that H.S.M. was negligent in (1) constructing a drop ceiling in the room in such a way that insufficient air was allowed to circulate around the fixtures; and (2) constructing a drop ceiling consisting of combustible ceiling tiles and without a sprinkler system. In its amended answer, defendant also alleges that plaintiff's insured (3) negligently permitted storage of panels and flammable or combustible materials in an area without approved sprinklers or without adequate fire extinguishing systems; (4) stored these materials in violation of the ordinances of the City of St. Louis, and; (5) installed, maintained, used and *895 permitted the use of florescent lighting fixtures that did not have adequate ventilation as required by various codes.
The reasoning of this Court's decision renders a detailed analysis of the specific allegations of the complaint and the affirmative defenses unnecessary. Before plaintiffs can recover under any of the theories advanced, they must show that defendant's product was defective and that it caused the damage alleged. The Court finds that plaintiffs have failed to carry their burden of proof in this cause and, consequently, judgment must be for defendant.
Preliminarily, the Court must take note of the proper burden of proof to be exercised in this case. In a diversity case such as this, the burden of proof is regarded as a matter of substance and, hence, it is governed by the laws and decisions of the states. Wright and Miller, Federal Practice and Procedure, § 2409 (1971); Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Peterson v. Mountain States Tel. & Tel. Co., 349 F.2d 934 (9th Cir.1965). In Missouri, as in all other states, the burden of proof is on the plaintiff. Chandler v. New Moon Homes, Inc., 418 S.W.2d 130 (Mo.1967); Wallace v. Bounds, 369 S.W.2d 138 (Mo.1963). The extent of plaintiff's duty is that he must remove the case from the field of conjecture and establish it by substantial evidence of probative value, or by inferences reasonably to be drawn from the evidence. Farnham v. Boone, 431 S.W.2d 154 (Mo.1968); Beshore v. Gretzinger, 641 S.W.2d 858 (Mo.App.1982).
In the instant cause, plaintiffs must prove a number of issues seriously disputed by defendant. First, plaintiff must show that the fire was aerial and that it originated in the room containing defendant's ballast. Second, plaintiff must show that the light fixtures in said room were powered. Third, plaintiff must show that the fire started in the accused ballast and not in another ballast or in the light fixtures. Specifically, under plaintiffs' theory of the case, it must be proven that the asphaltic pitch melted out and escaped the ballast case and channel cover. Furthermore, the pitch must have retained sufficient heat to cause the fire when it landed on the wrapped panels in the room. Moreover, plaintiff must explain why the solder joints that were pasted to the ballast did not melt off, thereby terminating the power. Finally, plaintiff must show that the alleged defect in the product could have been corrected by a thermal protector.
On each of these points, a significant degree of physical evidence and expert witness testimony has been presented which conflicts with plaintiffs' theory. Indeed, in some aspects, plaintiffs' evidence conflicts with itself.
Plaintiffs have presented expert testimony that the fire originated near the ceiling of the room containing the accused ballast. Defendant's evidence indicates that the fire started in a nearby vacant office. While the testimony of plaintiffs' experts is weakened somewhat by their initial confusion concerning the mounting of the fixtures in the fire room, this Court does accept plaintiff's assertion concerning the point of origin of the fire.
In like manner, there is a dispute concerning whether the fixtures were powered at the time of the fire. The report of plaintiffs' experts indicated that they believed that the fixtures were powered because the lights were in the "on" position. Defendant, however, effectively rebutted this conclusion by noting that the switch was a three-way switch and, therefore, it was impossible to determine from this single switch whether the lights were powered. Plaintiffs' second argument, that the lights were powered, rests on the fact that two of the fuses servicing the lights were blown. However, this appears to contradict the report of their own experts that the fuses were blown because of heat transmitted through the electrical wires. Thus, there remains a substantial degree of doubt from independent evidence that the lights were powered. The Court has, however, accepted plaintiffs' expert testimony that the fire was aerial in origin. The logical assumption incident to this conclusion *896 is that the fixtures were powered. Therefore, the Court accepts plaintiffs' theory that the ballast was powered.
It is at this point, however, that plaintiffs' case disintegrates. Accepting plaintiffs' theory of the location of the fire room and the origin of the fire in that room is insufficient to establish the totality of plaintiff's case. Plaintiffs, quite simply, have failed to prove that the accused ballast precipitated the fire.
Plaintiffs have presented expert testimony concluding that the accused ballast started the fire because the copper wires in the ballast were embrittled and there was no paint on the inside of the ballast case. Preliminarily, the Court must note that expert testimony is not binding on the trier of fact and may be given only such weight as the circumstances warrant. Mopkins v. St. Louis Die Casting Corp., 569 F.2d 454 (8th Cir.1978); Skar v. City of Lincoln, 599 F.2d 253 (8th Cir.1979). Moreover, in this case there is a difference of opinion between two experts. The Court, therefore, is acutely aware of its role as final arbiter. Pittman v. Gilmore, 556 F.2d 1259 (5th Cir.1977).
This Court can not agree that the accused ballast precipitated the fire at issue. Too many other factors intervene. Defendant has indicated an alternative source of the fire could be the fixture. Defendant points out that there is a possible arc mark on the fixture. Additionally, not all the fixture wiring was retrieved from the fire. Thus, defendant raises the possibility of a fixture fire. As noted previously, the manufacturer of the fixture could not be ascertained.
Plaintiffs' fail to rebut this possibility effectively. Plaintiffs state only that the arc mark indicates that the fixture was powered and, therefore, supports plaintiffs' case. Plaintiffs apparently misperceive, however, the thrust of defendant's argument, i.e., that the physical evidence indicates a separate, alternate source of the fire.
Moreover, plaintiffs have failed to show why the thermal protector inherently designed into defendant's ballast, i.e. the solder joints, was ineffective. Plaintiffs state only that the temperature at the solder joints may not have been the temperature at the point of the fire in the ballast. While this hypotheses may be accurate, the empirical evidence introduced to support it remains vague and indeterminate.
Furthermore, plaintiffs have failed to demonstrate why a thermal protector would be significantly more effective than the pasted solder joints in preventing a ballast from over-heating. In point of fact, this Court retains grave doubts that plaintiffs have shown that the alleged defect of defendant's product could have been cured by introduction of a thermal protector into the ballast. This portion of plaintiff's case suffers the same evidentiary defect as the remainder of its case.
Plaintiffs have also failed to adequately explain the differences between the ballasts and fixtures presented to the Court. As defendant indicates, there is apparently one ballast and one fixture for which no corresponding ballast and fixture were ever found. This assertion is never rebutted by plaintiffs except to the extent that they question the expertise of defendant's witness in this regard and suggest that the manufacturer of the fixture may have matched it with the incompatible ballast. The Court finds neither of these arguments persuasive and, hence, must conclude that a relevant fixture and ballast were never retrieved from the fire.
Without all of the relevant evidence introduced, the testimony of plaintiffs' expert as to the cause of the fire becomes virtually useless. The absence of one ballast renders the ranking of embrittledness of the copper wire incomplete. Since this is a major portion of plaintiffs' theory, this Court cannot find that plaintiffs have carried their burden of proof.
Plaintiffs would rely on Winters v. Sears, Roebuck and Co., 554 S.W.2d 565 (Mo.App. St.L.1977) as support for the proposition that circumstantial evidence may be used *897 to establish a defect in a product. The court does not dispute this proposition, however, the factual distinctions between Winters and the present cause are clear and dispositive. Winters involved a two-year old television set which caused a fire. Plaintiffs' expert could not state with particularity which component of the set had caused the fire other than to indicate that it was in the area of the picture tube. Defendant argued that this was insufficient to sustain a cause of action. The Court rejected defendant's argument and affirmed judgment for plaintiff.
The basis for the Winters Court's decision was sound. Although the particular defective component could not be identified, the product was one unit sold by the defendant. Therefore, the defendant's liability extended to the television set as a whole. Once it was established that there was a defect, the liability followed.
That situation is not extant in the present cause. In this case a range of products not manufactured by defendant may have ignited the fire. Plaintiffs have identified only defendant's ballast as the defective product. This claim is based on incomplete and doubtful circumstantial evidence. Plaintiffs have failed to carry their burden of proof. Judgment, therefore, must be for defendant.