The AETNA CASUALTY AND SURETY
COMPANY and Southwestern Bell
Telephone Company, Appellants,

v.

GENERAL ELECTRIC
COMPANY, Appellee.

No. 84–1299.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 12, 1984.

Decided March 29, 1985.

Anthony Sestric, St. Louis, Mo., for appellants.

Gerald D. Morris, St. Louis, Mo., for appellee.

Before BRIGHT, Circuit Judge, HENLEY, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

The Aetna Casualty and Surety Company and Southwestern Bell Telephone Company (hereafter, "Aetna") appeal a judgment entered for General Electric Company in this product liability case based on theories of negligence, breach of express and implied warranties, and strict liability. Aetna had claimed that a General Electric ballast (a small transformer attached to a fluorescent lamp) was the cause of a substantial fire. The district court[1] 581 F.Supp. 889, in a bench trial concluded that under all three theories Aetna had to prove that the ballast was defective and that it had not met its burden to do so. Aetna appeals, arguing primarily that the district court applied a burden of proof more applicable to negligence cases than to product liability cases and that numerous factual findings were clearly erroneous. We affirm the judgment of the district court.

On the evening of February 5, 1979, a fire started in the Syndicate Trust Building in St. Louis, Missouri. The fire caused considerable damage for which Aetna, as insurer of the property, and Southwestern Bell, which had stored equipment in the building, sought recovery. Each filed separate lawsuits, which were then consolidated and tried together.

Aetna argues that a ballast manufactured by General Electric was the source of the fire. Ballasts are small transformers—devices used with fluorescent lights to pro-

---

1. The Honorable H. Kenneth Wangelin, Senior United States District Judge for the Eastern and Western Districts of Missouri.

vide sufficient voltage to start such lights and to limit the flow of electrical current to them. They contain both copper coils and an asphaltic pitch compound. Evidence was presented that ballasts may, at the end of their operating lives, overheat. When this happens, hydrogen gas is generated, which, in turn, may cause "embrittlement" in the copper coils. The coils then may short out, causing even higher temperatures to develop. Eventually, the asphaltic pitch may catch fire, liquify, and flow out of the ballast casing, thereby causing a fire.

Aetna argues exactly this happened in the fire. Aetna presented two expert witnesses, William Buxton and Charles Cima, who examined the fire scene and were able to conclude that the fire had started in the ceiling light fixtures. After recovering the ballasts and fixtures, which had fallen to the floor as the fire progressed, the experts further concluded that the fire had started in a light fixture to which a General Electric ballast was attached. Another expert for Aetna, Roger Landers, examined the ballasts and concluded that one of the General Electric ballasts was most likely of the recovered ballasts to have caused the fire, since it had a high degree of embrittlement and also had paint remaining on the outside but not on the inside, thus suggesting the embrittlement was caused by internal high temperatures. There was also evidence that the General Electric ballast did not have an internal thermal protector and that there is recognition in the industry of the need for such protectors.

Of the evidence presented by General Electric, two areas are particularly significant in view of the district court's findings of fact. First, Walter Powell, an electrical expert, testified that because the ballasts and fixtures recovered did not all match up, there was one missing ballast and one missing fixture. Powell also testified that the fixture to which the "accused" ballast was attached showed signs of arcing or sparking on the fixture itself. He further testified that he made this determination from photographs he took in January 1982, that the accused fixture was never in the court-

room during the trial, and thus that it was not available for further examination. Second, a metallurgist, Donald Askelund, testified that when he subjected a similar ballast to external high temperatures, embrittlement and melting of the asphaltic pitch occurred.

The district court accepted a number of Aetna's claims, namely, that the fire started in the room in which the accused ballast was located, that the fire was aerial in origin, and that the light fixtures were powered at the time the fire commenced. The court concluded, however, that Aetna had failed to prove that the accused ballast precipitated the fire. The court pointed to General Electric's evidence of a possible arc mark on the fixture as suggestive of an alternative source of fire in the fixture. Also, the court found that not all of the fixture wire had been retrieved and that there was apparently one fixture missing and one ballast missing for a four-foot forty-watt lamp fixture that was in evidence. The court found that Aetna had failed to rebut the possibility that the fire started in one of these artifacts and also had failed to show why the solder joints of the General Electric ballast would not themselves be effective as a means of thermal protection. Finally, the court found that the damage to the accused ballast might have been caused by the external heat of the fire rather than by a defect in the ballast. The court concluded that Aetna's claim that the ballast was the cause of the fire was based on incomplete and doubtful circumstantial evidence and that it had failed to carry the burden of proof. It therefore entered judgment for General Electric. Aetna appeals, arguing that the district court erred legally by applying the wrong standard in judging whether the burden of proof was met and factually by making several clearly erroneous findings.

## I.

The district court in its memorandum accompanying its judgment for General Electric, after noting that the burden of

proof in a diversity case is governed by state law, stated that in Missouri the burden of proof lies on the plaintiff, who must "remove the case from the field of conjecture and establish it by substantial evidence of probative value, or by inferences reasonably to be drawn from the evidence." *Aetna Casualty & Surety Co. v. General Electric Co.*, 581 F.Supp. 889, 895 (E.D.Mo. 1984). Aetna argues that because in support of this statement the district court cited Missouri cases that did not involve product liability, the court "failed to examine Missouri's law on the burden in product liability cases" and "clearly made a mistake in applying a burden of proof appropriate for negligence cases which is a burden of proof inappropriate for products liability cases."

■ The burden of proof in a product liability case remains, of course, on the plaintiff, just as it does in most lawsuits. *See, e.g., Winters v. Sears, Roebuck & Co.*, 554 S.W.2d 565, 569 (Mo.Ct.App.1977); *Restatement (Second) of Torts* § 402A comment g (1965), *quoted in Weatherford v. H.K. Porter, Inc.*, 560 S.W.2d 31, 34 (Mo. Ct.App.1977). However, because product liability cases pose the unique issue of whether a product is defective, many Missouri decisions discuss the particular proof necessary with respect to this issue, which frequently requires resort to circumstantial evidence. Thus, proof of defects in product liability cases "must be realistically tailored to the circumstances which caused the form of action to be created." *Winters*, 554 S.W.2d at 569 (quoting *Lindsay v. McDonnell Douglas Aircraft Corp.*, 460 F.2d 631, 637–39 (8th Cir.1972) (plaintiff did not have to prove specific defect where circumstances suggested that airplane crash was probably due to manufacturing defect)). Impossible standards of proof are not required, *Winters*, 554 S.W.2d at 569, and "the quality and quantity of proof necessary" may be affected. *Patterson v.*

*Foster Forbes Glass Co.*, 674 S.W.2d 599, 604 (Mo.Ct.App.1984). The existence of a defect in a product may be inferred from circumstantial evidence, with or without the aid of expert testimony. *Williams v. Deere & Co.*, 598 S.W.2d 609, 612 (Mo.Ct. App.1980) (citing *Williams v. Ford Motor Co.*, 411 S.W.2d 443, 447 (Mo.Ct.App.1966)).

■ Nonetheless, the burden remains on the plaintiff, and if the plaintiff relies on circumstantial evidence to prove the defect, as did Aetna in the present case,

he does have the burden of establishing circumstances from which the facts necessary to prove his claim may be inferred, without resort to conjecture and speculation and the circumstances proved must point reasonably to the desired conclusion and tend to exclude any other reasonable conclusion.

*Weatherford*, 560 S.W.2d at 34 (quoting *Hale v. Advance Abrasives Co.*, 520 S.W.2d 656, 658 (Mo.Ct.App.1975)). Certainly the district court's statement as to Aetna's burden is thoroughly consistent with the *Weatherford* standard. A formulation of the standard that requires that inferences reasonably be drawn from the evidence does not, contrary to Aetna, impose a greater burden than a formulation which requires that inferences be made without resort to conjecture and speculation and be supported by circumstances pointing reasonably to the conclusions made. Thus, Aetna's claim that an improper legal standard was applied is without merit.[2]

■ Aetna also apparently argues legal error in asserting that "the district court erred in concluding that an inference of a defective product may only be drawn if the defendant manufactured or sold the entire fixture rather than the defective component alone." It is clear from the district court's memorandum opinion that it came to no such conclusion and did not dispute

---

**2.** While this was a bench trial, further answer to Aetna's claim that a different burden of proof should have been applied may be seen in the illustration accompanying Missouri's Approved Jury Instructions for product liability cases.

*See* Missouri Approved Jury Instructions 35.10 (1981). The illustration uses the general burden of proof instruction, *id.* No. 3.01, used in nearly all civil cases in Missouri.

"the *proposition* that circumstantial evidence may be used to establish a defect in a product." *Aetna,* at 897 (emphasis added). It may be, however, since Aetna discusses *Winters v. Sears, Roebuck & Co.* in connection with its contention, that Aetna is suggesting that the court erred in not applying the holding of that case. In *Winters,* a television set had caught fire. Winters' expert witness could not pinpoint a specific defect because too many parts of the set had burned up. Nonetheless, observing that "common experience tells us that some accidents do not ordinarily occur in the absence of a defect and in those situations the inference that a product is defective is permissible," 544 S.W.2d at 570, and taking into account not only the fact of the fire but also the way the set burned and the way picture tubes operate, the court concluded Winters had shown the set had a defect.

The district court in this case recognized that in *Winters* "[a]lthough the particular defective component could not be identified, the product was one unit sold by the defendant. Therefore, the defendant's liability extended to the television set as a whole." It distinguished *Winters* thusly: "In this case a range of products not manufactured by defendant may have ignited the fire. Plaintiffs have identified only defendant's ballast as the defective product. This claim is based on incomplete and doubtful circumstantial evidence." *Aetna,* at 897. Again, these statements are consistent with Missouri law. The *Winters* court itself took pains to distinguish the case before it from those cases where evidence did not "confine the origin of the fire to the product which was alleged to be defective." 554 S.W.2d at 571; *see also Weatherford,* 560 S.W.2d at 35 (*Winters* not applicable since accident involving hydraulic jack was not the type which common experience tells us would normally not occur in the absence of a defect); *Browning Ferris Industries v. Baden Tire Center,* 536 S.W.2d 203, 205 (Mo.Ct.App.1976) (mere fact that a tire blew out within minutes after it was installed did not prove the tire was defective since other possible causes for blowout were not eliminated.) Therefore, we find no error in the standards applied by the district court.

## II.

Aetna argues that the district court erred in a number of its factual findings. Our standard of review for such alleged error is, of course, whether the findings are clearly erroneous. Fed.R.Civ.P. 52(a). We must be left, after a review of the record, with the definite and firm conviction that a mistake has been committed. *Pullman-Standard v. Swint,* 456 U.S. 273, 284 n. 14, 102 S.Ct. 1781, 1788 n. 14, 72 L.Ed.2d 66 (1982) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948)); *Hoefelman v. Conservation Commission of Missouri,* 718 F.2d 281, 285 (8th Cir. 1983). The burden lies on Aetna to demonstrate error under Rule 52. *Reilly v. United States,* 513 F.2d 147, 150 n. 2 (8th Cir. 1975). As we stated in *Mears v. Olin,* 527 F.2d 1100, 1103 (8th Cir.1975), "We cannot review the case *de novo.* We view the evidence in the light most favorable to the prevailing party, * * * bear[ing] in mind that the trial judge has had the better opportunity to weigh the credibility of the witnesses." In *Mears* and *Hoefelman* we specifically applied the standard to the situation, which we also face here, where expert testimony was in conflict. The case before us was, in fact, essentially a contest among experts attempting to reconstruct the cause and course of the fire—a contest in which opinions and reasons for opinions varied widely. As the district court properly stated, "expert testimony is not binding on the trier of fact and may be given only such weight as the circumstances warrant. * * * *Skar v. City of Lincoln,* 599 F.2d 253 (8th Cir.1979)." *Aetna,* at 896.

## A.

We first consider Aetna's arguments that two specific factual findings were clearly erroneous. Donald Askelund, an expert metallurgist, had carried out an experiment which caused him to conclude

that external heat may cause embrittlement in a ballast. The court described the experiment as follows:

> The test ballast was placed in an oven and heated to fifteen hundred (1500) degrees Fahrenheit for approximately twenty-five (25) minutes, then allowed to cool. This procedure closely approximates the temperatures encountered in an actual fire.
>
> In the initial stage of the heating process, the ballast emitted a puff of white smoke. Sometime afterward all of the asphalt dripped out of the ballast case. Finally, when the ballast was extracted from the oven, the copper wire within it was extremely brittle.

*Aetna*, at 893.

Aetna asserts that this description is not supported in the record, arguing instead that the testimony was that the ballast was inserted when the oven was at 900°F and that, instead of melting, the asphalt "boiled out and ignited in one giant explosion." It is clear from Dr. Askelund's testimony, however, that he heated the oven to 1500°F, and then, having some second thoughts, since he had not experimented with ballasts before, lowered it to 900°F. and inserted the ballast. He then turned the oven up to 1500° and left the ballast in for approximately half an hour. At the conclusion of the experiment, he determined that "the tar had pretty much melted and run out." The district court's finding is fully supported by this testimony. More importantly, however, Aetna's objections do not reach the central finding of the district court: *external* high temperatures may cause embrittlement in ballasts. We cannot conclude that the district court clearly erred in this finding.

Aetna next argues that the district court erred in finding that "plaintiffs had not shown the extent of the fire protective preventive function of thermal protectors" and "had not shown whether the installation of a thermal protector would have prevented the fire in the present case." Aetna points out that there was in evidence a body of literature concerning the desirability of such thermal protectors in ballasts. The district court, however, recognized this evidence in finding that thermal protectors "do aid in the prevention of fires." *Aetna*, at 892. As the district court also noted, the key questions remained "whether a thermal protector would have prevented the fire in the *present* " case and what "the *extent* of this fire-prevention function" was. *Aetna*, at 892. There was evidence that, unlike other manufacturers, General Electric employed paste solder wire leads from the power supply into the ballast and that the material used as solder melts at temperatures between 460–500°F. This temperature is significantly below the 560°F fire point of asphalt, the 825°F self-ignition point of asphalt, and the 700–750°F temperature that is necessary to achieve hydrogen embrittlement. Thus, as the district court pointed out, Aetna "failed to show why the thermal protector inherently designed into defendant's ballast, *i.e.* the solder joints, was ineffective." *Aetna*, at 896. Aetna, however, argues this finding disregards the fact that since the solder points were at the opposite end of the ballast case from the coil, the coil could overheat before the solder would melt. However, the district court did not reject this hypothesis as wholly untenable but, rather, simply found that Aetna's evidence supporting it was "vague and indeterminate." *Aetna*, at 896. Of the two views advanced, the district court obviously accepted General Electric's explanation of the thermal protection function of the solder—a finding we cannot conclude to be clearly erroneous.

**B.**

We next turn to Aetna's attacks on the findings of the district court concerning the contentions and theories of the testifying experts. The district court properly made these findings concerning the conflicting expert testimony in analyzing the evidence and laying a foundation for its ultimate conclusions. Aetna argues here that the district court erred in determining "that Plaintiff's sole basis for believing

that the Defendant's ballast caused the fire was that the copper coil wire in the ballast was embrittled and that there was no paint on the inside of the ballast case." Rather, Aetna argues that these two physical facts were but two indicia establishing the General Electric ballast as the source of the fire, and that testimony also showed "it was fairly common knowledge within the industry that non-thermally protected ballasts do in fact cause fires." The district court, however, specifically found that ballasts not containing thermal protectors "can cause fires." *Aetna,* at 892. Nonetheless, the fact that ballasts *can* cause fires does not necessarily mean that a ballast *did* cause the fire in the present case. Aetna, however, points out that its experts also testified that once the ballasts burned free of their aerial supports, they fell to the floor where they were below the continuing fire, somewhat protected from continuing heat. Aetna's argument, then, apparently is that heat damage to the ballasts must have occurred internally, thus indicating a defect. However, the district court expressly found that the embrittlement of the wires the accused ballast might have been caused by the external heat of the fire. There was evidence from General Electric's witness, Walter Powell, and Dr. Lloyd Brown, who was called into the case early by one of Aetna's fire investigators, that there was embrittled wiring apart from the wiring in the ballast among the artifacts preserved from the fire and much embrittled copper wiring in the fire room. There likewise was evidence that all of the ballasts recovered had the paint missing on the inside. We cannot conclude that the district court clearly erred in making any of these findings.

Next, as regards the expert testimony, Aetna enumerates several findings which, it claims, show that the district court "con-fused the natural chain of events in a nonthermally protected ballast with an explanation of the defect in [General Electric's] product" and did not realize that "the defect was the absence of an internal thermal protector." We need not deal with this assertion in detail. The ultimate answer to this argument lies in the district court's finding that the extent of a thermal protector's fire-prevention function and whether a thermal protector would have prevented the actual fire was not clearly set forth by Aetna. We have already observed the evidence that supports this finding.

These arguments regarding expert testimony do no more than attack the periphery of the court's findings. They leave the core of the findings untouched, namely that there was insufficient evidence that the ballast caused the fire, and that the damage to the ballast could very well have been caused by external heat. Since the theories of the experts were in conflict, the district court was required to accept and reject portions of the testimony. Aetna has not left us with a firm impression that a mistake was made by the district court in reaching these findings.

### C.

■ Aetna next argues that "the district court erred in imposing on plaintiffs the burden of proving that there were no other possible fixtures and ballasts in the fire area which might have caused the fire." Aetna claims, citing *Markman v. Bi-State Transit System,* 457 S.W.2d 769, 771 (Mo. 1970) (plaintiff's burden of evidence is met when he has introduced sufficient evidence to make a prima facie case), that "the burden of proving the existence of the phantom ballast thus falls upon the Defendant." [3]

3. Aetna also cites us to *New York Life Ins. Co. v. Stoner,* 109 F.2d 874, 876 (8th Cir.), *rev'd,* 311 U.S. 464, 61 S.Ct. 336, 85 L.Ed. 284 (1940), where this court stated:

"Whenever the establishment of an affirmative case requires proof of a material negative allegation, the party who makes such allega-tion has the burden of proving it, especially where the most appropriate mode of proof is by establishing the affirmative opposite of the allegation." 22 C.J. Evidence, Sec. 15, p. 70. Aetna argues that here the party making the allegation of the possibility of an additional ballast was General Electric. However, Aetna

■ The short answer to Aetna's claim is that under the *Weatherford* standard Aetna never established its case. The district court found that there was "apparently one ballast and one fixture for which no corresponding ballast and fixture were ever found," *Aetna*, at 896, a finding which, as we note below, was supported by substantial evidence, and then noted that Aetna had failed to rebut the evidence supporting this finding. In using the term "rebut" the district court was not addressing any shift in the burden of producing evidence, for the trial was complete, but rather was referring to Aetna's ultimate burden of persuasion. Under *Weatherford*, Aetna was required to establish circumstantial evidence that "tend[ed] to exclude any other reasonable conclusion." 560 S.W.2d at 34. Whether we view the requirement as part of Aetna's prima facie case or as a necessary response to specific findings of fact of the court, in either case, since one might reasonably believe that the fire could have started in either the missing fixture or missing ballast, Aetna did not meet its burden.[4]

Aetna, however, apparently argues that the missing ballast was "claimed to exist only by Defendant's suggestion," that it was a "phantom ballast," and that there was "clear and unequivocal evidence that every fixture and ballast in the fire room was recovered." However, as the district court found, there was evidence that:

> was required under *Weatherford* not only to show that the circumstances surrounding the fire pointed toward the General Electric ballast as the source of the fire but also that they tended to exclude other sources. As Aetna alleged such circumstances under *Weatherford*, it bore the burden of showing them to be sufficient to establish its case. It is true that some Missouri cases have placed the burden of proof of a negative averment on a defendant where the proof lies peculiarly within the knowledge of the defendant. *See Emory v. Emory*, 53 S.W.2d 908, 913 (Mo.1932). However, if both parties are able to prove such averments, as was the case here, the burden of doing so is on the plaintiff. *See Kenton v. Massman Constr. Co.*, 164 S.W.2d 349, 352 (Mo.1942). In fact, here Aetna had the *first* opportunity to inspect the fire scene and gather the relevant artifacts.

the accused ballast and the other two ballasts that are * * * [similar models] will power and are compatible only with two-foot twenty (20) watt lamp fixtures, but that only two of these types of fixtures were presented to this Court, the accused fixture and a second two foot fixture. Thus, defendant concludes that a third two-foot fixture is missing.

Similarly, defendant concludes that the four-foot forty (40) watt lamp fixture presented to the Court has no compatible ballast. It cannot be powered by the extra 6G3512 model ballast, and all of the other fixtures and ballasts are perfectly matched. Thus, there is apparently a fixture and a ballast which were never retrieved from the fire room.

*Aetna*, at 894. Since Aetna presented no evidence to indicate that the fixtures and ballasts presented *were* compatible, we cannot conclude that the district court clearly erred in finding that there was a missing fixture and missing ballast.

■ Finally, Aetna takes issue with the district court's finding that: "Defendant argues that the absence of all of the fixture wiring in the fire room, in conjunction with the alleged arc mark, indicate that the fixture may have started the fire." *Aetna*, at 894. Aetna first argues that "no one has ever suggested or implied that the fixtures were capable of starting a fire."[5] However, Aetna does not dispute the fact that fires may start in light fixtures. The district court was not in error in concluding

4. In this regard, we observe that Aetna's expert, Roger Landers, admitted that if he had not seen all of the fixtures or all of the ballasts, he certainly could not have identified the General Electric ballast as the most likely source of the fire.

5. Despite Aetna's contention, the topic was addressed at trial, as Aetna's own expert, Rogert Landers, testified that "the electrical wiring contained in the fixtures does not normally just fail and arc together" and that "if you just take the electrical wiring that was up in the ceiling associated with the fixtures, the probability of that being the first thing to fail and cause a fire is pretty remote." Nonetheless, the possibility did exist—a possibility made more likely by the evidence of arcing on the fixture itself.

that Aetna's evidence had not excluded this source as one reasonable possibility. Indeed, Aetna appears to argue for such possibility itself in stating that "the electrical spark or arc * * * *could have been* the source of ignition, the addition of the spark which ignited the gaseous asphaltic pitch, * * *. Thus the evidence of arcing on the outside of a light fixture would have been the indicia of the outside source of ignition." (Emphasis added.) This statement not only argues against the chain of events in the "accused" ballast laid out by Aetna's expert witness, but also implies that if there was "outside" sparking, a number of scenarios could follow, only one of which involved the General Electric ballast. The central point, again, is that the General Electric ballast was not adequately established as the source of the fire.[6]

■ As the Supreme Court has stated, "An appellate court cannot substitute its interpretation of the evidence for that of the trial court simply because the reviewing court might give the facts another construction [or] resolve the ambiguities differently." *Inwood Laboratories v. Ives Laboratories,* 456 U.S. 844, 857, 102 S.Ct. 2182, 2189, 72 L.Ed.2d 606 (1982) (quoting *United States v. National Association of Real Estate Boards,* 339 U.S. 485, 495, 70 S.Ct. 711, 717, 94 L.Ed. 1007 (1950)); *see also Anderson v. City of Bessemer City,* —— U.S. ——, ——, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985) ("Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous."). Yet this is essentially the course Aetna urges upon us. After our careful review of the record, we cannot conclude that the findings of the district court that Aetna takes issue with were clearly erroneous. As we find no error here, nor in the articulation and application of the appropriate legal standards, we affirm the judgment of the district court.

6. Aetna also argues that the district court erred in allowing General Electric to amend its pleadings to assert affirmative defenses after the trial. Since the additional defenses had no bearing on

the district court's conclusion, which we are affirming, that Aetna had not met its burden of proof, we need not decide this issue.