53 F.Supp. 588 (1944)
ROETTIG
v.
WESTINGHOUSE ELECTRIC & MFG. CO. et al.
No. 894.
District Court, E. D. Missouri, E. D.
February 2, 1944.
*589 M. A. Ochsner, of St. Louis, Mo., for plaintiff.
Lon Hocker, Jr. (of Jones, Hocker, Gladney & Grand), of St. Louis, Mo., for defendants.
DUNCAN, District Judge.
Plaintiff is a resident and citizen of the State of Missouri. The defendant Westinghouse Electric and Manufacturing Company is a corporation, organized under the laws of the State of Pennsylvania. The defendant Westinghouse Electric Supply Company is a corporation, organized under the laws of the State of Delaware. The amount sued for exceeds $3,000. A jury trial was not requested.
Plaintiff's cause of action grows out of the explosion of an element composing a part of a heating unit of an ordinary electric cook stove manufactured by defendant Westinghouse Electric and Manufacturing Company and distributed through the defendant Westinghouse Electric Supply Company to Mack Electric Company of St. Louis and purchased by the plaintiff from the latter on August 29, 1940. The explosion occurred on November 6, 1940.
The element consisted of a stainless steel tube about eighteen inches long, wound into a flat spiral. The diameter of the inside of the tube was approximately one-fourth inch, and through the entire length of the tube was extended a coil or "resistance wire" called "nichrome", approximately one one-hundredth inch in diameter. This wire was secured in its position inside the tube by magnesium oxide placed there under high pressure.
In her declaration plaintiff alleges seven specific grounds of negligence, paragraph five of which is set out herein.[1]
Plaintiff testified that she used the stove and the particular element in the usual manner from the time of the purchase on August 29 until November 6; that during all of that period there was no indication of any defect in the element; that on the morning of the explosion she turned on the switch connected with this particular "burner" and that after a few minutes she observed that it was not heating as usual, but that a small area near the beginning of the coil or terminal was getting red; that she leaned over the stove to more closely observe it and that as she did so, a portion of the space which had become red, exploded, causing the escape of fumes, gas and smoke and throwing particles of molten metal into her face, nose and throat, thus causing her to be injured.
Shortly after the explosion plaintiff's daughter called the Mack Electric Company, and in response to that call a representative of the defendant Westinghouse Electric Supply Company came to plaintiff's home and removed the entire heating unit from the stove. A portion of the element, including the area of the explosion, was cut out and removed from the heating unit and was offered as an exhibit at the trial. The explosion had produced an ovalshaped hole in the stainless steel jacket approximately three-eighths inch long and one-fourth inch wide at the center. The nichrome wire and the magnesium oxide packing had been melted in a slightly larger area than the size of the hole in the jacket.
Before the exhibit was offered in evidence, it had been sawed almost in two on each side of the hole caused by the explosion and spread apart so that the interior was readily visible.
Plaintiff offered as an expert witness, H. S. Van Wallenback, assistant professor of electrical engineering in Washington University, and also a consulting electrical *590 engineer to private industrial firms. Professor Van Wallenback defined the composition of the elements making up the unit as iron, nickel, chromium and magnesia, and stated that the melting point of the nichrome wire or coil and the metallic jacket each was 1350° centigrade; that the melting point of the magnesium oxide was 2800° centigrade.
On direct examination Professor Van Wallenback testified that in his opinion any one of three conditions, which, if present, could have caused a short circuit and the explosion described in evidence, (1) improper centering of the nichrome wire or coil within the steel jacket so as to bring said wire and the inside of the surface of the jacket into contact, thus causing a short circuit, and (2) the presence of water or moisture in the jacket at the place where the short circuit and explosion occurred, and (3) the presence inside of the jacket of a foreign metallic body causing a contact between the nichrome wire and the surface of the inside of the jacket.
On cross examination he gave a fourth condition, which, had it existed, could have caused a short circuit. That is, a blow on the outside of the element or jacket of sufficient force to break the inside packing and permit the nichrome wire and the surface of the inside of the jacket to come into contact. It will be observed that in all four of the possible causes of the short circuit as described by Professor Van Wallenback, it was necessary that the nichrome wire and the inside of the jacket be brought into contact, either by the touching of the objects themselves, or by bringing them into contact by means of some conductor. The question therefore is, which one of these things did cause the short circuit?
A careful examination of the exhibit showed clearly that the nichrome wire had been centered, and for that reason, it could not have come into contact with the surface of the inside of the jacket. He therefore eliminated the first possible cause. He also eliminated the second as he could find no way in which water or moisture could have entered the jacket, and even if it had, he stated that heat would have absorbed it before it reached the melting point of 1350° centigrade. An examination of the exhibit showed no sign or marks on the surface indicating that a blow had caused the breaking of the packing, thus permitting the nichrome wire and the surface of the inside of the jacket to come into direct contact; so the fourth suggestion offered no solution and was abandoned as a possible cause. Thus, we have all the suggested possible causes, except one, eliminated. That is number three  the presence of a foreign metallic substance bridging the space between the nichrome wire and the inside surface of the jacket acting as a conductor and causing a short circuit.
Where the exhibit had been sawed and spread apart near the place of the explosion, there was visible, imbedded in the magnesium oxide, a dark object about the size of a small hair, and Professor Van Wallenback defined this object as a "foreign metallic substance". The witness testified that this "foreign metallic substance," shown in the exhibit, was of sufficient length, if properly placed, to extend from the nichrome wire in the center of the jacket to the surface of the inside of the jacket, a space of less than one-eighth of an inch.
There was no testimony as to the method of manufacturing the element, except by Professor Van Wallenback, who testified in a general way how the magnesium oxide was placed in the tube around the nichrome wire. He stated that such magnesium oxide should be free from foreign substance which might act as a conductor, thus producing a short circuit. The defendant offered no testimony except as to the plaintiff's injuries. In their answer defendants deny carelessness and negligence, and that they knew of any defect in the stove.
Defendant in its memorandum brief denies liability on the ground, first, that the case comes within the general rule that "a contractor, manufacturer, vendor or furnisher of an article is not liable to third persons who have no contractual relations with him for negligence in the construction, manufacture or sale of such article. Collier on Torts, 3 Ed., 1386", and second, that there is any proof of negligence or lack of care in the manufacture of the stove. It is admitted that there was no contractual relationship between the manufacturer and the plaintiff, and if this case comes within that rule, then of course, plaintiff is not entitled to recover. It may also be assumed that the defendant had no actual knowledge of any defect in the heating unit or in the element composing it.
There is a lack of uniformity of opinion with respect to the application of the general rule, and there are three well recognized exceptions: (1) Where the *591 negligent act is imminently dangerous and is committed in the preparation or sale of an article intended to preserve, destroy or affect human life. (2) Where the act is that of an owner combined with an invitation to the party thereby injured to use the defective appliance on such owners' premises. (3) Where the act consists in the sale and delivery of an article with knowledge of the undisclosed danger and without notice of its quality whereby any person is injured in a way that might reasonably have been expected.
There has been a general tendency on the part of the court to broaden the exceptions. As was said in MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696, Ann.Cas.1916C, 440: "The principle that the manufacturer or seller of goods is liable for injuries to persons due to defects therein, is not limited to things which, in their normal operation, are implements of destruction, but if the nature of the thing is such that it is reasonably certain to place persons in peril when negligently made, the liability attaches, irrespective of contract for failure properly to inspect and discover defects, coupled with knowledge of probable danger therefrom."
The question has recently been passed on in Missouri, in McLeod v. Linde Air Products Co., 318 Mo. 397, 1 S.W.2d 122 and at loc.cits. 406 and 126, respectively, the Court said: "The early cases limited exception 1 to things in their nature destructive, such as poisons, explosives, and deadly weapons. * * * We think the exception should be extended to include `a thing which when applied to its intended use becomes dangerous,' although not inherently so. There is no reason why the principle should not apply to things imminently dangerous, whether inherently so or not."
The court further said at loc.cit. 405 of 318 Mo., loc.cit. 125 of 1 S.W.2d: "The authorities on the point are not harmonious; but the better doctrine, it seems to me, is that the manufacturer of a thing inherently dangerous, or of a thing which when applied to its intended use becomes dangerous, is liable in damages to any one who, without fault on his part, sustains injury, which is the natural and proximate result of the manufacturer's negligence."
Certainly an electric stove is not a thing inherently dangerous. It may become dangerous only through negligence in its use, or negligence in its manufacture. If the stove, or the element which was a part of it, when put to its intended use became dangerous through the negligence of the manufacturer, then this case would fall within the rule laid down in MacPherson v. Buick Motor Co., and McLeod v. Linde Air Products Company, supra. The question is then  was defendant Westinghouse Electric and Manufacturing Company guilty of negligence in the manufacture of the element or unit. I believe it was. I believe the short circuit was caused by the presence of a foreign metallic particle in the magnesium oxide and that its presence was the result of negligence on the part of the manufacturer. My finding as to the cause of the short circuit is based entirely upon the testimony of Professor Van Wallenback.
The study of electricity is a science to which many men devote their lives. It is one of the greatest of man's aids. Probably it has contributed more than any other one thing to our industrial accomplishments. Yet, it is something about which most of us know but little. Of itself, we know it is a dangerous thing. If understood and properly controlled, it is among man's greatest friends. If not, it may become his deadly enemy. For those who must make decisions with respect to its technical use, but are lacking in technical knowledge with respect to it, it certainly would be wise and more conducive to safety and accuracy to seek the advice of those who have such knowledge, those who have studied the science of the thing itself and its use.
The only testimony in this case respecting electricity and its use was given by Professor Van Wallenback. A review of his testimony indicates that his scientific study of electricity and his experience in the practical application of his knowledge, qualify him to speak on the subject as an expert. The testimony of an expert witness, like any other witness, is to be weighed by the trier of the fact and given such weight as it is entitled to have. In this case, the testimony was with respect to a scientific and mechanical subject not within the knowledge of those not experienced in its use. Such testimony was not disputed by the defendant. Therefore, I believe it may be relied upon as a correct basis for a finding as to the facts.
The foreign metallic particle visible in the opening of the exhibit of course, did *592 not cause the short circuit. That was still present in the element at the time of trial, but from the fact that there was such an object in close proximity to the place where the short circuit did occur, would justify the conclusion that another like particle was present at the place where the short circuit did occur, and thus did cause it. If the presence of such "particle" was likely to and did render the stove imminently dangerous when being used in the ordinary manner, it was the duty of the manufacturer to use ordinary care to prevent such particle from being in the element.
The defendant knew of course, being familiar with the science of electricity, what the effect of the presence of such a foreign metallic particle in the magnesium oxide likely would be. It was therefore the duty of the manufacturer to inspect the magnesium oxide prior to placing it in the jacket, to determine that there were no foreign metallic particles in it. The best evidence that the manufacturer did not use ordinary care to inspect such magnesium oxide, either prior to or at the time of its mixture and forcing into the jacket, was the presence of such a foreign particle in the element as shown by the exhibit offered in evidence. After the element was completed, the most minute inspection by the manufacturer or any other person would not have revealed the presence of such a foreign metallic body until it had caused a short circuit. To have properly inspected the mixture would have prevented the presence of the foreign metallic particle, and thus the injury to plaintiff.
In its brief defendant insists that the short circuit could not have been the result of defective manufacture because of the time which lapsed between the date of the purchase and the date of the explosion, during which time the element was in satisfactory use. In answer to that, the expert witness testified that expansion and contraction of the element with the heating and cooling thereof would likely cause the foreign particle to change its position, and that during the period of use it did so change its position, until it formed the contact between the wire and the jacket, thus causing a short circuit. When the contact was thus formed, the presence of the foreign metallic particle rendered the element imminently dangerous.
"It is not essential that [the] defendant could have anticipated the very injury complained of, or that it could have anticipated that it would have occurred in the exact manner in which it did occur, but it is sufficient that the negligence of the defendant was the proximate cause of the injury." McLeod v. Linde Air Products Co., 318 Mo. 397, 1 S.W.2d 122; Dean v. Kansas City, St. L. & C. R. Co., 199 Mo. 1, 97 S.W. 910.
In view of the foregoing, plaintiff is entitled to recover from the defendant Westinghouse Electric and Manufacturing Company. There is no testimony with respect to the defendant Westinghouse Electric Supply Company having any connection whatsoever with the manufacture of the stove. The evidence did show that this defendant delivered the stove after its purchase through the Mack Electric Company, and that it made the electrical connection with the electrical outlet in plaintiff's home. The action is based upon specific negligence, and not upon breach of warranty. Therefore, there can be no liability against defendant Westinghouse Electric Supply Company.
Plaintiff testified that the contents of the exploding area of the element were thrown into her face, and that portions of it entered her nose and mouth, causing her to choke and cough, and that as a result thereof, her throat and face were burned and pitted, and that her throat and lungs were permanently affected, and that she was caused to suffer from anemia. She further testified that following the explosion, there were present in the room fumes and smoke which caused her to choke and cough. The testimony also showed that immediately following the explosion, plaintiff's daughter came into the kitchen and brought her young baby and remained there for fifteen or twenty minutes. This indicated that the fumes and smoke in the kitchen were not of a very serious nature.
Plaintiff is forty-four years of age, and has been a widow for ten years. She testified that prior to her injury she had been in good health, but that since that time she had been under the care of doctors, and that in addition to her throat and nose infection, she had suffered from anemia, and had a blood transfusion therefor. That following the injury she lost thirty pounds in weight. At the time of the trial her weight was practically normal for a woman of her age and height.
As heretofore stated, the composition of the element was iron, nickel, chromium and magnesia. I am sure that there is no *593 suggestion that any one of these substances "was in any degree chemically toxic or dangerous". Magnesium oxide is the material used in taking flashlight pictures, and the amount present in the area of explosion was likely much less in quantity than the amount used in taking a picture. Certainly there could be no injurious effects from that small amount.
Plaintiff's glasses were presented at the trial and offered in evidence as an exhibit, and they clearly showed on the surface of the lenses that they had been pitted, which pits the plaintiff stated, were caused by the particles of molten matter. Undoubtedly some of these particles entered plaintiff's face, nose and throat. She did not see a doctor until November 11, five days after she claims to have been injured. She claimed to have suffered severe headaches for six or eight weeks after the injury, and that they gradually became less severe; that she had "two spells of nose bleeding" during which black particles were emitted from her nose.
Several doctors treated her and she was examined by others; one having been appointed by the court. Dr. Wackenfeld examined the plaintiff first, and testified that he "found her nose and throat raw, bronchial breathing both anterior and posterior, with periodic coughing spells during examination and spasms as air traveled from nose to lungs; that she complained of severe headaches and extreme nervousness". Dr. Rogers testified that plaintiff had "inflammation of the nose, nasopharynx and pharynx." Some weeks after the injury Dr. Rogers took small particles and black substance from her nose. He testified that the condition he found might reasonably have resulted from the particles she said were thrown into her face. Dr. Warner took X-ray pictures on December 29, 1940 and June 28, 1943. He found some "pari-bronchial" markings, a little more pronounced in the first than in the last picture, but he declined to express any opinion as to their origin. There was some medical testimony that certain lesions on her lungs indicated arrested tuberculosis, probably in childhood. Dr. V. V. Wood, specialist in otolaryngology, appointed by the court, examined plaintiff in 1941 and testified that he found nothing wrong with plaintiff's nose and throat, and that there were no symptoms of plaintiff having suffered any injury to either. Dr. Arthur M. Alden, also a specialist in otolaryngology, examined plaintiff and found no evidence of injury.
The testimony respecting plaintiff's medical expense was very indefinite, but it is apparent from the treatment she received, that it would amount to more than $200.
From a careful consideration of all the evidence, I am convinced that plaintiff sustained some injuries as a result of the explosion. I am also convinced that such injuries were not permanent. I believe in view of all the facts, that $1000 will adequately compensate plaintiff for such injuries, and that will be the amount of the court's finding.
A summary of the findings of fact and conclusions is made a part hereof for convenience.[2]
It is therefore ordered, adjudged and decreed by the Court (1) that plaintiff take nothing by her suit as to defendant Westinghouse Electric Supply Company, and that it go hence without day, and (2) that she have and recover of and from the defendant Westinghouse Electric and Manufacturing Company, the sum of $1,000, and (3) that the costs be assessed against defendant Westinghouse Electric and Manufacturing Company.
NOTES
[1] "5. That defendants negligently and carelessly packed said magnesium oxide around the wire in said metal tube without first examining and inspecting said magnesium oxide for foreign particles which came in contact with the wire and the metal tube, and negligently and carelessly failed to remove such foreign particles, when defendant knew, or by the exercise of ordinary care could and should have known that such failure to inspect and examine and such failure to remove said foreign particles would or might cause a short circuit and that an explosion was likely to occur and seriously injure and damage plaintiff."
[2] of Fact
1. Defendant Westinghouse Electric and Manufacturing Company was the manufacturer of the stove mentioned in evidence.
2. There were no contractual relations between plaintiff and said defendant, Westinghouse Electric Supply Company.
3. That the presence of a foreign metallic substance in the magnesium oxide caused the short circuit.
4. That the presence of a metallic particle in the magnesium oxide rendered the stove imminently dangerous when being put to its original use.
5. That defendant Westinghouse Electric and Manufacturing Company did not properly inspect the magnesium oxide prior to placing it into the tube or jacket.
6. That defendant Westinghouse Electric and Manufacturing Company was negligent in permitting such metallic particle to be in the element.
Conclusion
That defendant Westinghouse Electric Supply Company is not liable for any negligence.
That plaintiff is entitled to recover against defendant Westinghouse Electric and Manufacturing Company.