643 F.Supp. 499 (1986)
Sharon CHURCH, individually and as next friend and natural guardian of Stephanie Church and Jaime Church, Minors, Plaintiff,
v.
MARTIN-BAKER AIRCRAFT CO., LTD., Defendant.
No. 84-356A(5).
United States District Court, E.D. Missouri.
September 10, 1986.
*500 Burt Berry, Dallas, Tex., George Fleming, Houston, Tex., John J. Frank, St. Louis, Mo., John Betts, Houston, Tex., for plaintiff.
John C. Shepherd, Gerald Morris, St. Louis, Mo., Bruce D. Campbell, Steven S. Bell, Seattle, Wash., Terrence J. O'Toole, Rebecca R. Jackson, Peter J. Wendel, St. Louis, Mo., for defendant.

MEMORANDUM
LIMBAUGH, District Judge.
This matter is before the Court for a decision on the merits after trial to the Court sitting in admiralty. The case was tried before the Court in two time periods, to accomodate scheduling, for a total of fifteen days. On the first day of trial, plaintiff orally moved to dismiss, with prejudice, a former defendant, McDonnell Douglas. The next day, the Court granted plaintiff's motion. The Court also dismissed McDonnell Douglas' crossclaim against defendant Martin-Baker. At the conclusion of plaintiff's case, defendant Martin-Baker's motion for a directed verdict was made, submitted and taken with the case. Thus, the case before the Court consists of plaintiff's amended complaint *501 against defendant Martin-Baker in negligence and strict liability, and defendant Martin-Baker's motion for a directed verdict.
Plaintiff brings this action for damages for the wrongful death of Captain Stephen P. Church, under the Death on the High Seas Act (DOHSA), 46 U.S.C. § 761, et seq., and general maritime and admiralty law. Captain Church received fatal injuries while ejecting over the Gulf of Mexico from an F-4D aircraft using a Martin-Baker MK-H7 ejection seat. (The seat in question was actually a MK-H5 modified into a MK-H7; however, the modifications are not material to this lawsuit and the parties refer to the ejection seat as a MK-H5 or MK-H7 interchangably). Plaintiff alleges that the ejection seat is negligently designed, defective and unreasonably dangerous and that such defect(s) proximately caused Captain Church's death. Plaintiff further alleges that defendant Martin-Baker failed to give Captain Church adequate warning of the dangers of seat adjustment with regard to placement of the head on or near the face curtain housing/headbox assembly. Defendant claims that Captain Church's fatal injuries were caused by windblast forces exerted upon his head and neck at the time of ejection, and not by any aspect of the ejection seat design. Defendant further avers that Captain Church's injuries were sustained because he was in poor body position for ejection and ejection occurred at too low an altitude. If Captain Church's injuries are found to have been the result of the defective ejection seat, then defendant claims immunity from liability pursuant to the "government contract defense".
After consideration of the testimony and exhibits introduced at trial, and the parties' briefs, the Court makes the following findings of fact and conclusions of law in accordance with Rule 52, Fed.R.Civ.P. The Court overrules any objections (that remain outstanding) to exhibits and testimony offered into evidence by either party.
The Court finds that plaintiff Sharon Church Schaeffer (presently remarried) is the widow and personal representative of the estate of Captain Stephen P. Church. She is also the natural guardian of Stephanie and Jaime Church (decedent's minor children). For purposes of the opinion, Mrs. Schaeffer and her two children will be collectively referred to as "plaintiff". Defendant Martin-Baker Aircraft Company, Ltd., is a foreign corporation with its only place of business in Great Britain. Defendant Martin-Baker is the manufacturer of the ejection seat on board the F-4 series military fighter aircraft. The ejection seat in question was a modified Martin-Baker MK-H5 ejection seat.
On June 29, 1978, Captain Stephen P. Church was participating in Air Force tactical manuevers, originating from McDill Air Force Base, Florida. Captain Larry Showalter piloted in the front seat of the F-4D aircraft and Captain Church was in the rear seat. The second aircraft was piloted by Lt. Bradley Sharpe. During the second intercept exercise, the credible evidence indicates that Captain Church's aircraft went out of control and descended toward the water in a steep dive traveling in excess of 400 knots. The Court finds that the last known position of Captain Church's aircraft, seconds before impact, was at an altitude of approximately 10,000 feet.
It is undisputed that Captain Church initiated a lower handle single seat ejection from the rear seat of the aircraft which was designed to eject the rear seat only. Based upon Lt. Sharpe's testimony regarding the length of time between his last visual contact with the aircraft and his sighting of Captain Church's parachute in the water, the Court finds the rate of descent was in excess of 1,000 feet per second. The credible evidence further indicates that ejection was initiated at a low altitude, somewhere between 1,100 to 1,300 feet. The credible evidence further shows that despite the low altitude ejection, Captain Church obtained full personal parachute canopy deployment. Captain Church's ejection was not successful and he died as a result of injuries received during the ejection process. The pilot apparently *502 died without attempting ejection when the aircraft struck the water.
The official Air Force reports, i.e. the Life Sciences Report and Autopsy Report, estimate death around 9:15 a.m. Captain Church's body was retrieved between 10:00 a.m. and 10:45 a.m., at which time it was viewed by Major Roger Dennes in the rescue helicopter. Captain Church's body was returned to McDill Air Force base at approximately 12:30 p.m., at which time it was visually examined by Dr. Eugene DeMatte, the Air Force pathologist and flight surgeon. Dr. DeMatte's autopsy report indicates that a more thorough examination and autopsy was conducted later that day at 5:00 p.m.
Also retrieved with Captain Church's body were certain personal effects. The ones relevant to this cause were Captain Church's right nomex glove and his flying helmet. The fingertip of the glove's forefinger had been singed by heat contact. The helmet, found separate from the body, had significant damage to it. The damage to the helmet is detailed in the report made before the Air Force Accident Investigation Board by Michael Grost, the McDill Air Force Base field representative, who investigated the accident pursuant to Air Force orders. According to Mr. Grost's uncontradicted findings, the visors had been torn away from the mounting tracks, the oxygen mask had been ripped out of its bayonet support retention housings, the chin strap was broken away from the right strap fastener and the internal rear liner insert had been displaced from within the helmet until it had contacted the nape strap. The rear of the helmet had black, yellow and red markings along with cracks in the helmet shell. The evidence indicates that these markings match the black, yellow and red coloration of the face curtain handles and housing unit on the ejection seat headrest assembly. The credible evidence shows that the colored markings on the helmet resulted from impact at some point during ejection with the upper ejection handles and housing.
Dr. DeMatte testified that his preliminary examination of Captain Church's body, upon arrival at McDill, revealed a normal range of motion for the head and neck. His autopsy report lists cause of death as drowning and the following significant injuries: cervical, cervical cord and brain stem contusions, facial contusions and lacerations, compression fracture, vertebral body L-1, and contusions right shoulder and extremities. The skeletal examination shows that most of the trauma occurred on the left side of the neck and face, and the left arm. The Court finds of particular significance the presence of a 15 × 8 cm. bruise on the left side of the decedent's neck. The microscopic examination revealed the following relevant findings: minimal tracheal vascular congestion and perivascular hemorrahages in the upper cervical cord, medulla, cerebellum and brain stem. There was acute hemorrhaging in a portion of the skeletal muscle and fibrous connective tissue in the posterior neck. Although the autopsy report notes evidence of drowning with regard to lungs, no specifics are provided. Finally, the autopsy report further notes that as to damage sustained by the spinal cord, "NONE GROSSLY VISIBLE". The autopsy report does not state the cause of the brain stem and cervical contusions.
Major Dennes testified that when he first saw Captain Church's body in the rescue helicopter, he felt that the decedent's head was angled unusually far to the right. With his superior's approval he contacted Dr. Leon Kazarian, a biomechanical engineer and Dr. Steven Combs, a board certified orthopedic surgeon. Both doctors were on staff at the Air Force Aeromedical Research Lab (AMRL) at Wright-Patterson Air Force Base. Both of these doctors have done extensive research regarding ejection seat injuries.
Dr. Kazarian contacted Dr. DeMatte to request Dr. DeMatte to remove Captain Church's cervical column intact and send it to him for examination. The credible evidence indicates that Dr. DeMatte removed Captain Church's spinal cord in two separate portions by severing the cord at approximately *503 the base of the skull. Inadvertently, the lower portion of the cord was frozen, rendering it useless for dissection and examination. After examination of the upper cervical cord, medulla and brain stem, Dr. DeMatte removed the decedent's cervical column intact, froze it and shipped it to Dr. Kazarian.
The Court finds that Dr. Combs was primarily responsible for the examination of Captain Church's cervical column. After removing the base of the skull, Dr. Combs found unusual mobility of the C-1, C-2 juncture. This juncture is the point at which the C-1 vertebrae (atlas) meets the C-2 vertebrae (axis); i.e. where the head and spine are connected. Specifically, his gross examination revealed that the tectorial membrane and posterior longitudinal ligament were torn and that the posterior capsule of the left C-1, C-2 facet joint were also torn and attenuated. Dissection of the cervical column revealed that the underlying fibro fatty tissue in the vicinity of the compromised left posterior capsule of C-1 and C-2 was torn and hemorrhagic. Dr. Combs took photographs of the cervical column (as he examined it). However, the Court finds these photos of little evidentiary use because they have no identifying names, marks, or any visible identification as being Captain Church's cervical column.
On July 18, 1978, Dr. Kazarian sent by telex to the Safety Board, the AMRL findings. Dr. Combs testified that the telex was an edited version of notes he gave Dr. Kazarian regarding the examination of Captain Church's cervical column. The Court finds the notes (discovered during the course of trial) to be of little evidentiary value because they are undocumented, undated and lack any reference to the decedent.
Finally, the Court finds that on July 21, 1978, the Air Force Safety Board issued its Life Sciences Report. There was in-court testimony and pronouncements in post-trial briefs as to the Safety Board's final determination as to cause of death. This Court is constrained to reach its ultimate determination based upon what is actually before it via testimony and admitted evidence. What is filed before the Court is a "sanitized" Life Sciences Report; i.e. certain portions deleted by the Air Force pursuant to the "safety investigation privilege" under the Freedom of Information Act (FOIA), 5 U.S.C. § 552 and Air Force Regulation 127-4. The "unsanitized" Life Sciences Report is filed under seal and neither the Court nor presumably the parties nor their attorneys have reviewed it.
The sanitized Life Sciences Report consists of flight data, certain medical information, personal data, equipment data, egress data, rescue operation data and a section for the flight surgeon's and life support officer's comments, analysis and recommendations. Both Dr. DeMatte and Major Dennes signed the Report. The sanitized report does not contain any comments, analysis or recommendations by Dr. DeMatte or Major Dennes. Most importantly, the sanitized report does not contain any reference as to how Captain Church became incapacitated, nor does it reach a conclusion as to cause of death.
The foregoing findings of fact are purposefully narrowly drawn. After a review of all the evidence, the Court finds that the plaintiff has failed to sustain her burden of proof as to causation. Looking at the evidence in a light most favorable to the plaintiff, the Court concludes that the plaintiff has failed to show, by a preponderance of the evidence, that the alleged defect in the ejection seat proximately caused Captain Church's death.
Plaintiff alleges that the Martin Baker MK-H5/7 ejection seat is negligently designed, or in the alternative, is unreasonably dangerous. She further alleges that defendant failed to warn decedent of certain defective or dangerous characteristics of the seat. Defendant principally argues that the ejection seat was not responsible for Captain Church's fatal injuries.
This Court has jurisdiction over this cause of action pursuant to the Death on the High Seas Act (DOHSA), 46 U.S.C. § 761, et seq., and general principles of maritime and admiralty law. Plaintiff's *504 cause of action is brought both in strict liability and negligence.[1] Both a strict liability cause of action and a negligence cause of action are recognizable in a DOHSA case. Spinks v. Chevron Oil Co., 507 F.2d 216 (5th Cir.1975) (negligence action under DOHSA); Lindsey v. McDonnell-Douglas Aircraft Corp., 460 F.2d 631 (8th Cir.1972) (strict liability action under DOHSA).
Missouri adopted the doctrine of strict liability in tort, as stated in the Restatement of Torts (2d) § 402A, in Keener v. Dayton Electric Mfg. Co., 445 S.W.2d 362 (Mo.1969). See, Lindsey, supra; Blevins v. Cushman Motors, 551 S.W.2d 602 (Mo. 1977). The pertinent provisions of § 402A state:
(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
(a) the seller is engaged in the business of selling such a product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
Specifically, the Eighth Circuit has required a plaintiff to prove that 1) the product, when sold, was in a defective condition unreasonably dangerous for use; 2) the product reached the user without substantial change from the condition in which it was sold; 3) the accident was proximately caused by the defective condition; and 4) the product was being used at the time of the accident in a manner reasonably anticipated by defendant. Laney v. Coleman Co., 758 F.2d 1299, 1301-1302 (8th Cir. 1985); Vanskike v. ACF Industries, 665 F.2d 188, 194-195 (8th Cir.1981) cert. den. 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982).
In negligence cases, a plaintiff has to prove that a defendant breached its duty of care in the design or manufacture of a product, and that this breach was a proximate cause of injury. See, Roettig v. Lindsay, at 637 quoting Nicklaus v. Hughes Tool Co., 417 F.2d 983, 986 (8th Cir.1969); Westinghouse Elec. & Mfg. Co., 53 F.Supp. 588 (D.Mo.1944); Blevins v. Cushman Motors, supra.
Under Missouri law, proof of causation is a required element of a plaintiff's product liability case, whether it be under a strict liability or negligence theory. Laney, supra; Roettig, supra; Duke v. Gulf & Western Mfg. Co., 660 S.W.2d 404, 409 (Mo.App.1983). Assuming arguendo, that a plaintiff sustains the burden on all other elements, failure to establish causation is still fatal to a plaintiff's cause of action.
In this case, plaintiff has theorized that upon ejection, the back of decedent's head hit the face curtain handle assembly unit, resulting in a spinal cord contusion. Captain Church was rendered unconscious and drowned in the Gulf of Mexico. Defendant, however, counters plaintiff's theory with another probable explanation for Captain Church's death, i.e. Captain Church's neck was broken by external windblast forces unrelated to the design of the ejection seat. If plaintiff is to prevail on the issue of causation, she must prove by a preponderance of the evidence that any of the claimed defects or the absence of a warning about such claimed defects was the proximate cause of Captain Church's death. Indeed, plaintiff must show that it is more probable than not that decedent died from an injury caused by a design defect of the ejection seat.
*505 The plaintiffs' burden of proof may be met with circumstantial evidence; however, "he must remove the case from the field of conjecture and establish it by substantial evidence of probative value, or by inferences reasonably to be drawn from the evidence." Aetna Casualty and Surety Co. v. General Electric Co., 581 F.Supp. 889, 895 (D.Mo.1984), aff'd. 758 F.2d 319 (8th Cir.1985). The plaintiff is not required to eliminate every possible contrary explanation but the plaintiff does have the burden of establishing circumstances from which the facts necessary to prove plaintiff's claim may be inferred, without resort to conjecture and speculation, and such circumstances proved must point reasonably to the desired conclusion. Most importantly, the facts inferred must tend to exclude any other reasonable conclusion. Aetna Casualty & Surety Co., 758 F.2d at 322, 581 F.Supp. at 895; Ocean Barge Transport Co. v. Hess Oil Virgin Islands Corp., 726 F.2d 121, 124 (3rd Cir.1984); Noel v. United Aircraft Corp., 342 F.2d 232 (3rd Cir.1965), (remanded only on issue of damages, issue of liability affirmed) 219 F.Supp. 556, 566 (D.Del.1963); Glass v. Allis-Chalmers Corp., 618 F.Supp. 314, 316 (D.Mo.1985), aff'd. 789 F.2d 612 (8th Cir. 1986); Kropp v. Douglas Aircraft Co., 329 F.Supp. 447 (D.N.Y.1971); Hale v. Advance Abrasives Co., 520 S.W.2d 656, 658 (Mo. App.1975).
In order for the plaintiff to recover under any of the theories she has advanced, she must show that the defendant's product was defective and that it caused Captain Church's death. The Court finds that the plaintiff has failed to carry her burden of proof in this cause and, thus, judgment must be for the defendant.
Both the plaintiff and defendant presented to this Court a significant amount of physical evidence and expert testimony. Plaintiff's evidence, albeit credible, simply failed to negate the defendant's theory for decedent's death, which was as probable (if not more probable) than an alleged defect in the ejection seat.
What exactly happened on June 29, 1978, will forever remain a mystery. One minute Captain Church's jetfighter was in the air. Only seconds later, it collided with the sea, almost immediately after Church ejected. There is some evidence to suggest Captain Church died during ejection when his helmet struck the ejection unit, or at that time was rendered helpless so that he ultimately drowned. Defendants' evidence suggests he died during ejection because of windblast forces. Therefore, the Court must decide whether plaintiff has shown by a preponderance of all the evidence as a whole that decedent's death was more likely caused by his helmet impacting a defective face curtain handle assembly unit during ejection and his ultimate drowning than by windblast forces. Plaintiff sought to prove her theory through expert testimony and physical evidence. However, much of plaintiff's expert testimony was effectively rebutted by defendant's expert testimony, and the physical evidence relied upon was as supportive for defendant as it was for plaintiff.
According to the Air Force Accident Report, the accident occurred around 9:30 a.m. Captain Church's body was not retrieved until approximately 10:45 a.m. and not returned to the base until 12:30 p.m. Dr. DeMatte testified that he saw Captain Church's body initially for a cursory examination when the body was first brought back to the base. He did not begin the autopsy until approximately 5:00 p.m. that day. The uncontroverted testimony of Dr. John Feegel, a board-certified forensic pathologist and former chief medical examiner for Tampa, Florida, establishes that rigor mortis sets in approximately 30 minutes after death and peaks in 8-10 hours. The credible medical evidence indicates that hyperotation of the neck would not be obvious three to eight hours after death, when Dr. DeMatte viewed the body. Since Dr. DeMatte had never before performed an "ejection seat autopsy", he was not particularly inclined toward looking for evidence of a hyperotational injury. Although he found a large bruise on the left side of the *506 neck, he did not investigate the cause of the bruising.
Dr. DeMatte further testified that he concluded death by drowning due to an overall assessment of certain physical factors: the body was found in the water and presence of edema fluid in the lungs. He further concluded that drowning occurred because Captain Church's helmet hit the back of the face curtain assembly unit causing a blow to his head which rendered him incapacitated by cervical cord and brain stem contusions. Although Dr. DeMatte offered this explanation to the Court for Captain Church's drowning, he did not note this opinion in the autopsy report. He simply listed drowning as the cause of death; however, Dr. DeMatte's medical findings as regards drowning are by his own admission not foolproof. Both he and Dr. Feegel testified that the findings were not only consistent with drowning but also with suffocation.
Dr. DeMatte admitted that tracheal congestion and the presence of edema fluid are also indicative of suffocation. Dr. Feegel furthermore questioned the conclusion of drowning since Dr. DeMatte did not check for salt water in the lungs, and there was no hemalysis of the lungs and no diatoms were found in the lungs. Dr. Feegel, who had performed several hundred autopsies on drowning victims, stated that edema fluid in and of itself is not evidence of drowning. Dr. DeMatte agreed with this conclusion. Based upon the credible medical evidence, the Court agrees that death by drowning was not the only reasonable explanation to be drawn from the autopsy findings and that suffocation was equally a possible medical conclusion.
The balance of the medical testimony involved the probability of a hyperotational injury. Dr. DeMatte did not make an internal examination of Captain Church's cervical column. Instead, he removed it for examination by Drs. Combs and Kazarian. He further testified that he found no visible signs, such as gross hemorrhaging of a hyperotational injury.
Drs. Combs and Kazarian testified that there was significant evidence of hyperotation at the C-1, C-2 joint, damage to the posterior ligament and capsule, fibro fatty tissue at C-1, the C-2 joint being hemmorhagic and the 8 × 15 cm. bruising on the left side of decedent's neck. They refuted Dr. DeMatte's testimony by pointing out that the material composing the spinal cord is gelatinous and would have returned to its normal shape after the initial compression, and that instantaneous death (by suffocation) would have prevented external hemotomas from developing on the outer surface of the spinal cord at the injury site. Drs. Combs, Kazarian and Feegel all stated that it was quite possible that Dr. DeMatte cut through the trauma site on the cord when he chose to remove the cord in two sections.
There was also considerable dispute concerning which ligaments serve to restrain rotational movement of the head upon the neck. After reviewing the conflicting medical testimony and concentrated efforts at deciphering the offered portions of Gray's Anatomy, the only conclusion this Court can state with lay certainty is that numerous ligaments, capsules and membranes serve to check movement of the head on the neck. Whether or not the alar ligaments are the primary restraints is of little value to the Court since several people performed various dissections of Captain Church's spinal cord and column over a period of time.
The only other medical testimony came from plaintiff's expert, Dr. Y. King Lui. He testified that Captain Church's injuries were caused by direct massive impact upon the helmet. He opined that the impact was not enough to crack the skull but the skull was pressed against the brain. As the pressure increased, the brain and cerebellum suffered bruising.
Dr. Lui is not a medical doctor. His expertise is in biomechanics. He has never seen a hyperotational injury in a human and his work is primarily with animals. He reached his conclusion without examination of Captain Church's spinal column or his *507 helmet. Furthermore, there is no evidence of this conclusion in the autopsy report. In fact, the autopsy report listed the brain as normal. The Court is not inclined to give substantial weight to Dr. Lui's conclusions.
Plaintiff's other expert on the issue of causation was Michael Grost. Mr. Grost took many slides of portions of the wreckage and of Captain Church's wearing apparel, especially the helmet. He amassed his findings and proffered a reconstruction of the accident in a report he filed before the Air Force Accident Investigation Board. Mr. Grost testified (and his report concurs) that the colored markings on the back of decedent's helmet match the coloration of the face curtain handles and housing. He concluded that the helmet and the upper ejection handles and housing had been in contact. He further concluded that Captain Church had not been in a good body position at ejection primarily because his head had been leaning forward and to the right. Although Mr. Grost testified that he believed that ram air forces initially pushed Captain Church's head into the metal headrest assembly whereby Captain Church suffered a brain contusion rendering him unconscious, his report filed in July, 1978, does not overwhelmingly support his present opinion. Indeed, his report is inherently contradictory. In that portion of his report detailing his observations regarding the flying helmet, he first reasons that "ram air drove head violently back into face curtain firing handle...." However, he then finally concludes that "[I]n essence, the head was displaced violently by ram air which caused the upper cervical spine to undergo a severe rotational extension to the right, which resulted in cervical cord contusion." (Statement of Michael Grost before Accident Investigation Board, pg. 10). In fact, Mr. Grost's report consists of several theories as to what could have occurred, all of which are equally probable.
The investigation of Captain Church's death produced a number of reports (including M. Grost's report and Dr. DeMatte's autopsy report) with the most important one being the Life Sciences Report. The Life Sciences Report is the culmination of findings by members of the Safety Investigation Board. Both parties contend that the Board's findings as to cause of death supports their respective theories; however, the Court is not privy to such information. What was filed with this Court was a "sanitized" Life Sciences Report; i.e. certain portions deleted pursuant to the Freedom of Information Act, 5 U.S.C. § 552 and Air Force Regulation (AFR) 127-4 (safety investigation privilege). Dr. DeMatte testified that he could not recall what was in the original report, but believed that the sanitized report had pertinent material, especially Section IX, removed. In essence, he could not recall what the Life Sciences Report stated as to cause of death. Major Dennes testified that the AMRL report (Drs. Combs and Kazarian's hyperotational dislocation findings) was communicated directly to the Safety Board which adopted the report and incorporated it into the Life Sciences Report.
The fact of the matter is that the sanitized Life Sciences Report makes absolutely no statement regarding cause of death. Defendant's counsel, however, states to this Court, "[T]he finding that decedent died as a result of the hyperotational injury appeared in Section IX of the Life Sciences Report, which is intended to contain the analysis, conclusions and recommendations about an accident and is prepared in concert by the Flight Surgeon and the Life Support Officer." (Defendant Martin-Baker Aircraft Company's Post-Trial Brief, p. 13). Since the Air Force has delivered to all counsel only the sanitized report (Section IX omitted), and the Court has reviewed only the sanitized report (the unsanitized report is still filed under seal with the Court and the Court has chosen not to review it), it is unknown how defendant's counsel's can recite findings yet unseen by anyone involved in this litigation. As far as this Court is concerned, the Life Sciences Report in evidence in this case does not make a conclusive statement as to cause of death.
*508 The several reports contain opinions, analyses, conclusions, findings and recommendations of various people requested by the Air Force to investigate the June 29, 1978 accident. The Court finds these reports helpful in an advisory fashion but they are not final determinations nor do they constitute legal judgments. The Court gives only such weight to these reports as the circumstances warrant, and as such is not compelled to be bound by any conclusion reached by any one of these reports. See, Kropp, at 472.
Plaintiff's burden was to prove to this Court by a preponderance of the evidence, that a defect in the ejection seat caused Captain Church to receive incapacitating head injuries, resulting in his drowning. Defendant offers hyperotational dislocation (due to ram air forces exerted on decedent's head) as an alternative theory for cause of death. Plaintiff fails to rebut this possibility effectively. The autopsy evidence equally supports a finding of suffocation as it does drowning. Consequently, the autopsy findings in conjunction with Dr. Combs' and Dr. Kazarian's medical findings easily render, with a degree of medical certainty, a conclusion that decedent suffered a hyperotational injury. The markings on Captain Church's helmet indicate impact with the face curtain assembly unit but offers no clue as to the precise time of impact. Captain Church's neck could have already been broken when the back of his head and helmet hit the face curtain assembly unit. This is a possibility that the Court cannot ignore in light of all the evidence. Finally, the single most comprehensive report pursuant to the investigation of Captain Church's death, lacks a finding as to cause of death. The Air Force's determination as to cause of death remains hidden in the exorcised portions of the Life Sciences Report. It is not for this Court to speculate as to what the Safety Board concluded.
The Court has viewed all the evidence in a light most favorable to the plaintiff and finds that her theory of death is no more probable than defendant's theory. The evidence, at best, fails to establish, with definite certainty, whether Captain Church died as a result of any defect in the ejection seat or from external windblasts causing a hyperotational dislocation. As plaintiff has failed to carry her burden of proof, judgment must be for defendant on the claims of product defect under strict liability and negligence.
Plaintiff's remaining claim is a strict liability cause of action for failure to warn. Specifically, plaintiff avers that defendant Martin-Baker failed to warn decedent about the dangers of his head (or helmet) impacting upon the metal wedge-shaped headbox assembly during the ejection sequence or at least of the danger of adjusting his seat so as to allow contact between his head and the headbox unit. Defendant Martin-Baker argues that it has not breached any duty to warn because there is no potential hazard regarding the face curtain handle or assembly unit, and that plaintiff has failed to establish that the failure to warn was cause-in-fact and the proximate cause of decedent's death.
A manufacturer of a product has a duty to warn if that manufacturer knows, or should know that the product is likely to be dangerous when put to its anticipated use and that the user of the product will not realize the dangerous condition. Kontz v. K-Mart Corp., 712 F.2d 1302, 1304 (8th Cir.1983); Griggs v. Firestone Tire & Rubber Co., 513 F.2d 851, 856-57 (8th Cir.1975) cert. den., 423 U.S. 865, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). Even if there is no manufacturing or design defect in the product, such a product may still be rendered defective or unreasonably dangerous by the lack of an adequate warning. McGowne v. Challenge-Cook Bros., 672 F.2d 652, 660 (8th Cir.1982); Griggs, supra; Frazier v. Materials Transp. Co., 609 F.Supp. 933, 935 (D.Pa.1985); Duke v. Gulf & Western Manufacturing Co., 660 S.W.2d 404, 418 (Mo.App.1983); Racer v. Utterman, 629 S.W.2d 387, 393 (Mo.1981) cert. den. 459 U.S. 803, 103 S.Ct. 26, 74 L.Ed.2d 42 (1982). However, the issue of proximate cause still must be satisfied in a *509 failure-to-warn case in order for the plaintiff to prevail. There must be a causal connection between the lack of warning and the plaintiff's injury. Griggs, at 856; Frazier, at 935. "Liability is imposed where injury resulting from the use of the product is attributable to a breach of this `duty to warn'." Griggs, at 856.
Since plaintiff has failed to show that any design defect in the ejection seat contributed to decedent's death, the Court is unable to determine that defendant's failure to warn of any alleged defect was the proximate cause of Captain Church's death. Furthermore, plaintiff has failed to prove, by a preponderance of the evidence, that defendant knew or should have known that the face curtain handle assembly unit was hazardous due to potential impact and that a warning was required. The two people most knowledgeable about the utilization of the MK-H5/7 seat in F-4 jets testified that defendant Martin-Baker had no indication that the face curtain handle headbox presented any danger during ejection. Mr. Rudolph Delgado, egress systems safety manager at the Air Force Safety and Inspection Center, monitors all ejection incidents and mishaps. He testified (by deposition) that he knew of no incident or mishap in which a crew member was fatally injured as a result of his head impacting upon the face curtain headrest assembly. He further testified that one of his chief responsibilities is to advise the Air Force as to design deficiencies in the F-4 escape system. He has never reported a design deficiency regarding the face curtain headrest assembly. Mr. Denis Burrell, chief executive officer of defendant Martin-Baker (and an employee of twenty-five years), testified that there have been over 2,000 ejections from the F-4. Mr. Burrell has never been notified that the face curtain handle assembly on the F-4 ejection seat presented any kind of danger whatsoever.
Plaintiff's ejection seat experts, Dr. Lui and Wilfred Kenyon, concluded that the design of the MK-H5/7 seat was defective because a crew member could adjust his seat so as to make contact with the headbox assembly. The Court finds their expert testimony insufficient to substantiate plaintiff's allegations. As previously pointed out, Dr. Lui is an expert on central nervous system trauma, not egress systems. His research has been primarily with animals. His only prior experience with the MK-H5 seat was in 1973 when he reported a study he had done on the effects of ejection on the spinal column. His report did not identify any problem associated with the design of the seat. Wilfred Kenyon has an extensive background regarding egress systems. He has had experience in designing ejection seats for Lockheed; however, his investigation background has been limited solely to mishaps involving Lockheed ejection seats. His familiarity with the MK-H5/7 seat was gained primarily through the present litigation. Although he considers the MK-H5/7 to be defectively designed due to independent seat adjustment, he admitted that most users of ejection seats have replaced his own Lockheed seat with the MK-H7 (the successor to MK-H5).
The Court concludes that plaintiff's evidence failed to substantiate a causal connection between defendant's alleged failure to warn crew members of the dangers of adjusting the seat bucket so as to allow contact between the head and the headrest assembly, and decedent's injuries. She has failed to sustain her burden of proof; accordingly, judgment must be for defendant on plaintiff's claim in strict liability for failure-to-warn.
Defendant in summary proceedings, which were taken with the case, and at trial, urged the Court to find that it had no obligation to plaintiff because of the "government contractor defense." This defense in some circuits has been upheld by immunizing contractors from liability incurred during the performance of government contracts. As judgment is to be entered for defendant on the merits, it is unnecessary to consider the government contractor defense issue.
NOTES
[1] Defendant has only provided a legal brief pertaining to plaintiffs' strict liability claim due to a misconception that plaintiffs' complaint was amended so as to plead only a strict liability claim. However, the Court's endorsement (of March 8, 1985) on plaintiffs' motion for leave of court to amend plaintiffs' complaint only allowed plaintiffs to amend so as to sue as personal representatives of decedent's estate. All other aspects of the plaintiffs' original complaint alleging strict liability and negligence remained intact. At trial plaintiffs presented evidence in support of their negligence claim, and plaintiffs' post-trial briefs refer to both a strict liability claim and a negligence claim.